IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:19-CV-157-D

| | | |
|---|---|---|
| DIJON SHARPE, Plaintiff, | ) | |
| v. | ) | **ORDER** |
| WINTERVILLE POLICE DEPARTMENT, Officer WILLIAM BLAKE ELLIS, in his official capacity, and Officer MYLES PARKER HELMS IV, both individually and in his official capacity, Defendants. | ) | |

On November 3, 2019, Dijon Sharpe ("plaintiff" or "Sharpe") filed a complaint against the Winterville Police Department ("WPD"), Officer William Blake Ellis ("Ellis") in his official capacity only, and Officer Myers Parker Helms IV ("Helms") in both his individual and official capacities (collectively, "defendants"), alleging violations of 42 U.S.C. § 1983 and the First Amendment that arise from Sharpe recording and real-time broadcasting a traffic stop involving Sharpe (who was a passenger in the car), Helms, and Ellis. See Compl. [D.E. 1]. On February 3, 2020, the defendants filed a partial motion to dismiss and supporting memorandum, seeking dismissal of the claims against WPD and Helms in his individual capacity. See [D.E. 15, 16]. On February 24, 2020, Sharpe responded in opposition. See [D.E. 19]. On March 9, 2020, the defendants replied. See [D.E. 20]. On August 14, 2020, the court heard argument on the motion. As explained below, the court grants the defendants' partial motion to dismiss.

I.

Sharpe resides in Pitt County, North Carolina. See Compl. ¶ 7. On October 9, 2018, Helms and Ellis, as officers of WPD, properly stopped a car in which Sharpe was riding in the front-

passenger seat. See id. at ¶¶ 19–20. Sharpe then "turned on the video recording function of his smartphone and began livestreaming – broadcasting in real-time – via Facebook Live to his Facebook account." Id. at ¶ 22. During the traffic stop, Helms approached the car and asked Sharpe his name, which he declined to provide. See id. at ¶ 24. Helms and Ellis then returned to their patrol car. See id. at ¶ 25. When Helms returned to Sharpe's car, he asked Sharpe, "What have we got? Facebook Live, cous?" Id. at ¶ 27 (alteration omitted); see Pl.'s Ex. A [D.E. 1-2] 17. Sharpe responded: "Yeah." Compl. at ¶ 28; see Pl.'s Ex. A at 17. Helms reached in and attempted to grab Sharpe's phone, pulling on his seatbelt and shirt in the process. See Compl. at ¶ 28. Helms stated, "We ain't gonna do Facebook Live, because that's an officer safety issue." Pl.'s Ex. A at 17. Later, Ellis remarked: "Facebook Live . . . we're not gonna have, okay, because that lets everybody y'all follow on Facebook that we're out here. There might be just one me next time [sic] . . . It lets everybody know where y'all are at. We're not gonna have that." Id. at 19–20.[1] Ellis continued: "If you were recording, that is just fine. . . . We record, too. So in the future, if you're on Facebook Live, your phone is gonna be taken from you . . . [a]nd if you don't want to give up your phone, you'll go to jail." Id. at 20. Towards the end of the stop, Ellis stated, "But to let you know, you can record on your phone . . . but Facebook Live is not gonna happen." Id. at 21.

Sharpe makes two claims. First, Sharpe alleges a violation of 42 U.S.C. § 1983 and the First Amendment against Helms and Ellis, in their official capacities, and WPD. See Compl. at ¶¶ 37–43. As for Helms and Ellis, Sharpe states that they "physically attacked" him and "threatened to deprive" him of his First Amendment right to record and real-time broadcast his interactions with law enforcement. Id. at ¶ 40. As for WPD, Sharpe cites Monell v. Department of Social Services of New York, 436 U.S. 658 (1978), and alleges "an unconstitutional policy, custom, or practice of

---

[1] Ellis was correct. See Compl. at ¶ 23; https://www.facebook.com/d.r.sharpe/videos/2251012878304654/ (last visited Aug. 14, 2020) (listing "Realtime Comments" including, inter alia, "Keep your live on", "It keep pausing", "Where ya'll at", "What kind of bull is going on now", "Did he just grab your phone!???", and "Handle it once it's off").

preventing citizens from recording and livestreaming their interactions with police officers in the public performance of their duties." Id. at ¶ 41. Second, Sharpe alleges a violation of 42 U.S.C. § 1983 and the First Amendment against Helms in his individual capacity. See id. at ¶¶ 44–48. Specifically, Sharpe asserts that "[t]he physical attack by Officer Helms on Mr. Sharpe" violated his First Amendment rights. Id. at ¶ 47; see [D.E. 19] 6–7.[2] Sharpe seeks nominal damages, reasonable attorney's fees, costs, and a declaratory judgment concerning whether Sharpe "has the right, protected by the First Amendment . . . to both (a) record police officers in the public performance of their duties and (b) broadcast such recording in real-time." Compl. at 8.

II.

A motion to dismiss under Rule 12(b)(6) tests the complaint's legal and factual sufficiency. See Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(b)(6) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences "in the light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 352 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015). A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal,

---

[2] In responding to defendants' motion to dismiss and at oral argument, Sharpe disclaimed reliance on the Fourth Amendment and stated that the complaint involves only "an issue of First-Amendment protected conduct." [D.E. 19] 6.

556 U.S. at 678–79. Rather, a plaintiff's allegations must "nudge[ ] [his] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

When evaluating a motion to dismiss, a court considers the pleadings and any materials "attached or incorporated into the complaint." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011); see Fed. R. Civ. P. 10(c); Thompson v. Greene, 427 F.3d 263, 268 (4th Cir. 2005). A court also may consider a document submitted by a moving party if it is "integral to the complaint and there is no dispute about the document's authenticity" without converting the motion into one for summary judgment. Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165–66 (4th Cir. 2016). Additionally, a court may take judicial notice of public records when evaluating a motion to dismiss for failure to state a claim. See, e.g., Fed. R. Evid. 201; Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

## III.

### A.

Defendants move to dismiss WPD as a defendant under Rule 12(b)(6) of the Federal Rules of Civil Procedure. See [D.E. 15] 1; [D.E. 20] 1–3. Defendants contend that Sharpe has failed to state a claim for which relief can be granted because WPD is not an entity that can be sued under North Carolina law. See [D.E. 20] 1–3. Sharpe responds that "[t]he inclusion of [WPD] as a separate named Defendant was a prophylactic measure . . . in the event the official capacity claims were somehow procedurally defective." [D.E. 19] 2. Thus, Sharpe "defers to the Court's judgment regarding the motion to dismiss [WPD] as a discrete entity." Id. At oral argument, Sharpe conceded that WPD was not a proper entity to sue.

State law determines the capacity of a state governmental body to be sued in federal court. See Avery v. Burke Cty., 660 F.2d 111, 113–14 (4th Cir. 1981). Accordingly, this court must predict how the Supreme Court of North Carolina would rule on such a state law issue. See Twin City Fire

Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted).[3] In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there [are] persuasive data that the highest court would decide differently." Toloczko, 728 F.3d at 398 (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a [s]tate's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (alteration and quotation omitted); see Day & Zimmerman, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

"The capacity of a governmental body to be sued in the federal courts is governed by the law of the state in which the district court is held." Avery, 660 F.2d at 113–14; see Fed. R. Civ. P. 17(b). A North Carolina county is a legal entity which may be sued under certain circumstances. See N.C. Gen. Stat. § 153A–11. Likewise, a North Carolina city or town is a legal entity which may be sued under certain circumstances. See N.C. Gen. Stat. § 160A–485; see also id. § 160A-1(2) (noting that "'[c]ity' is interchangeable with the terms 'town'" for purposes of section 160A). However, there is no corresponding statute authorizing suit against a North Carolina county police department or town police department. See, e.g., Parker v. Bladen Cty., 583 F. Supp. 2d 736, 740 (E.D.N.C. 2008); Moore v. City of Asheville, 290 F. Supp. 2d 664, 673 (W.D.N.C. 2003), aff'd, 396 F.3d 385 (4th Cir.

---

[3] North Carolina does not have a mechanism to certify questions of state law to its Supreme Court. See Town of Nags Head v. Toloczko, 728 F.3d 391, 397–98 (4th Cir. 2013).

2005); Coleman v. Cooper, 89 N.C. App. 188, 192, 366 S.E.2d 2, 5, disc. review denied, 322 N.C. 834, 371 S.E.2d 275 (1988), overruled in part on other grounds by Meyer v. Walls, 347 N.C. 97, 489 S.E.2d 880 (1997). Accordingly, the court dismisses WPD as a defendant under Rule 12(b)(6).

B.

Defendants also move to dismiss the section 1983 claim against Helms in his individual capacity. See [D.E. 15] 2. In support, Helms asserts qualified immunity concerning the claim against him individually because Sharpe did not have a First Amendment right to record and real-time broadcast Helms and Ellis publicly performing their police duties on October 9, 2018. Alternatively, Helms asserts that such a right was not clearly established on October 9, 2018. See [D.E. 16] 4–11; [D.E. 20] 3–7. Sharpe disagrees. See [D.E. 19] 3–8.

Helms is entitled to qualified immunity under section 1983 unless "(1) [he] violated a federal statutory or constitutional right, and (2) the unlawfulness of [his] conduct was 'clearly established at the time.'" District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quotation omitted); see Ray v. Roane, 948 F.3d 222, 226 (4th Cir. 2020). "'Clearly established' means that, at the time of the [official's] conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." Wesby, 138 S. Ct. at 589 (quotation omitted); see, e.g., City of Escondido v. Emmons, 139 S. Ct. 500, 503–04 (2019) (per curiam). "A court may consider either prong of the qualified immunity analysis first." Ray, 948 F.3d at 226; see Sims v. Labowitz, 885 F.3d 254, 260 (4th Cir. 2018).

Although the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quotation and citation omitted); see Wesby, 138 S. Ct. at 590; Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). In the Fourth Circuit, "existing precedent" includes precedent of the United States Supreme Court,

the Fourth Circuit, and the highest court of the state in which the action arose. See Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 176 (4th Cir. 2010).[4] "In the absence of 'directly on-point, binding authority,' courts may also consider whether 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" Ray, 948 F.3d at 229 (quoting Booker v. S.C. Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017)).

As for the first prong of the qualified immunity analysis, Sharpe alleges that Helms retaliated against him in violation of the First Amendment by attempting to prevent the recording and real-time broadcasting of their encounter. See [D.E. 19] 6–8. "[A] First Amendment retaliation claim under § 1983 consists of three elements: (1) the plaintiff engaged in constitutionally protected First Amendment activity, (2) the defendant took an action that adversely affected that protected activity, and (3) there was a causal relationship between the plaintiff's protected activity and the defendant's conduct." Booker, 855 F.3d at 537; see Raub v. Campbell, 785 F.3d 876, 885 (4th Cir. 2015).

As for the first element, the court assumes without deciding that Sharpe engaged in constitutionally-protected free speech when he recorded and real-time broadcasted his encounter with Helms. As for the second element, the court assumes without deciding that Helms "took an action that adversely affected" Sharpe's recording and real-time broadcasting activity. Booker, 855 F.3d at 537. Helms attempted to grab Sharpe's phone during the encounter. Sharpe pulled away and Helms grabbed Sharpe's seatbelt. See Pl.'s Ex. A at 17–21. This conduct did not interrupt Sharpe's recording and real-time broadcasting, and Sharpe recorded and broadcast the entire encounter. Nonetheless, such conduct "may tend to chill individuals' exercise of constitutional rights." Am. Civ. Liberties Union of Md., Inc. v. Wicomico Cty., 999 F.2d 780, 785 (4th Cir. 1993); see Perry v.

---

[4] The United States Supreme Court has held that its precedent qualifies as controlling for purposes of qualified immunity. See Wesby, 138 S. Ct. at 591–93 & n.8. The Supreme Court has reserved judgment on whether decisions of a federal court of appeals are a source of clearly established law for purposes of qualified immunity. See id.; Kisela, 138 S. Ct. at 1152–54; Taylor v. Barkes, 135 S. Ct. 2042, 2044–45 (2015) (per curiam); City & Cty. of S.F. v. Sheehan, 135 S. Ct. 1765, 1776 (2015); Carroll v. Carman, 574 U.S. 13, 16–17 (2014) (per curiam).

Sindermann, 408 U.S. 593, 597 (1972), overruled on other grounds by Rust v. Sullivan, 500 U.S. 173 (1991). A police officer reaching into a vehicle to grab a phone that is real-time broadcasting "would likely deter a person of ordinary firmness from the exercise of First Amendment rights." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005) (quotation omitted) (collecting cases).

As for the third element, the court assumes without deciding that a clear causal relationship exists between Sharpe's recording and real-time broadcasting and Helms's conduct. "In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of [plaintiff's] protected activity." Id. at 501; see Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998). A plaintiff must also show temporal proximity between defendant's awareness of the plaintiff's protected activity and the adverse action. See Constantine, 411 F.3d at 501. Here, Helms asked Sharpe: "What have we got? Facebook Live, cous?" Pl.'s Ex. A [D.E. 1-2] 17. Sharpe responded, "Yeah." [D.E. 1-2] 17. Immediately after this exchange, Helms attempted to grab Sharpe's phone. See id. Helms then stated, "We ain't gonna do Facebook Live, because that's an officer safety issue." Id. The allegations demonstrate both knowledge and temporal proximity. Helms grabbed at Sharpe's phone only after learning that Sharpe was recording and real-time broadcasting. Accordingly, the court assumes without deciding that Sharpe has adequately pleaded a First Amendment retaliation claim.[5]

As for the "clearly established" prong of the qualified immunity analysis, Sharpe's right to record and real-time broadcast his encounter with police must have been clearly established on October 9, 2018. See, e.g., Wesby, 138 S. Ct. at 589; Emmons, 139 S. Ct. at 503–04. It was not.

---

[5] This assumption does not affect the "clearly established" prong of the court's analysis. See, e.g., Fields v. City of Phila., 862 F.3d 353, 360–62 (3d Cir. 2017); Turner v. Lieutenant Driver, 848 F.3d 678, 685–90 (5th Cir. 2017); Gericke v. Begin, 753 F.3d 1, 7–10 (1st Cir. 2014); Am. Civ. Liberties Union of Ill. v. Alvarez, 679 F.3d 583, 594–603 (7th Cir. 2012); Glik v. Cunniffe, 655 F.3d 78, 82–85 (1st Cir. 2011); Smith v. City of Cumming, 212 F.3d 1332, 1332–33 (11th Cir. 2000); Fordyce v. City of Seattle, 55 F.3d 436, 439–40 (9th Cir. 1995).

There is no precedent from the Supreme Court, the Fourth Circuit, or the Supreme Court of North Carolina that clearly established this legal right on October 9, 2018. The closest Supreme Court or Fourth Circuit case is Szymecki v. Houck, 353 F. App'x 852 (4th Cir. 2009) (per curiam) (unpublished). In Szymecki, the Fourth Circuit affirmed a district court's conclusion "that [plaintiff's] asserted First Amendment right to record police activities on public property was not clearly established in this circuit at the time of the alleged conduct." Id. at 853. Of course, "the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity." Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). But the Supreme Court has repeatedly counseled that "'clearly established law' should not be defined 'at a high level of generality.'" White v. Pauly, 137 S. Ct. 548, 552 (2017) (quoting al-Kidd, 563 U.S. at 742); see, e.g., Wesby, 138 S. Ct. at 590; Plumhoff v. Rickard, 572 U.S. 765, 779 (2014); Ray, 948 F.3d at 229.

Sharpe's activity not only involves the right of a passenger in a stopped vehicle during a traffic stop to record police, but also to real-time broadcast such a recording during the traffic stop. Cf. White, 137 S. Ct. at 552 ("As [the Supreme] Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case."). Indeed, Ellis made precisely this distinction—Sharpe recording versus recording and real-time broadcasting—during the traffic stop. See Pl.'s Ex. A at 19–20. Although other circuit courts have published opinions recognizing the right to record police in performing their public duties, no circuit court has addressed the right of a passenger in a stopped vehicle during a traffic stop to record and real-time broadcast police in performing their public duties.[6] On October 9, 2018, when Helms attempted to grab Sharpe's phone to prevent Sharpe from recording and real-time broadcasting during the traffic stop, it would not have been "clear to a reasonable officer that his conduct was unlawful [under the First Amendment] in the situation he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled on other

[6] This conclusion applies even under a generous reading of "consensus of persuasive authority" that includes sister circuits. Ray, 948 F.3d at 229 (quotation omitted).

grounds by Pearson, 555 U.S. 223, 231–43 (2009). Accordingly, Helms is entitled to qualified immunity.[7]

In opposition, Sharpe argues that anyone recording any traffic stop is the same as anyone real-time broadcasting any traffic stop. Sharpe then cites Ray and argues that "general constitutional principles or a consensus of persuasive authority" clearly established that First Amendment right on October 9, 2018. See Ray, 948 F.3d at 229.

The court rejects Sharpe's argument. As Sharpe admits, the Fourth Circuit has not held in a published opinion that an individual's right under the First Amendment to record a traffic stop is clearly established, much less held that an individual has a right to record and real-time broadcast a traffic stop from within the stopped car. Cf. Szymecki, 353 F. App'x at 852. Moreover, evolutions in technology help to defeat Sharpe's contention that recording a traffic stop from within the stopped car equals real-time broadcasting that traffic stop. It does not suffice for a court simply to determine whether an individual's behavior constitutes "recording" or not "recording" a traffic stop. After all, such "recording" may fall within five, distinct factual scenarios: (1) recording; (2) recording and real-time broadcasting; (3) recording and real-time broadcasting with geo-location information; (4) recording and real-time broadcasting with the ability to interact via messaging applications in real-time with those watching; and (5) recording and real-time broadcasting with geo-location information and the ability to interact via messaging applications in real-time with those watching. Recording an interaction preserves that interaction for the recorder's later use. In contrast, broadcasting the interaction contemporaneously conveys the interaction to another recipient. Broadcasting the interaction contemporaneously, with contemporaneous geo-location information, conveys both the interaction and the location at which it is occurring. And contemporaneous

[7] The court recognizes the current state of qualified immunity doctrine, and the debate about whether the Supreme Court or Congress should change it. See, e.g., [D.E. 19] 8 & n.6; William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018). As a lower court, however, this court must follow binding precedent.

messaging applications allow the individual recording, and those watching, to know the location of the interaction and to comment on and discuss in real-time the interaction. The circuit courts to which Sharpe points in support of his argument address an onlooker recording a police encounter as contemplated in the first scenario.[8] Thus, even assuming those cases indicate a "consensus of persuasive authority" concerning the first scenario, they do not address the other four scenarios. Additionally, none of those cases involved a recording by a passenger in a stopped vehicle during a traffic stop.

Sharpe's conduct falls within either the fourth or fifth scenario. Even broadly applying Ray, a "consensus of persuasive authority" cannot form on an issue the courts did not address. Sharpe invites the court to sweep all five scenarios into a simple "recording" category, but the court declines the invitation. To do so would ignore clear distinctions among the five scenarios, as well as the distinction between an onlooker versus a passenger in a stopped vehicle during a traffic stop. To do so also would ignore binding Supreme Court precedent and analyze an individual's First Amendment right to record a traffic stop from within a stopped vehicle at too high a level of generality. See, e.g., Wesby, 138 S. Ct. at 590; Pauly, 137 S. Ct. at 552; Plumhoff, 572 U.S. at 779.

That this case involved Sharpe recording and real-time broadcasting with the ability to interact via messaging applications in real-time with those watching a traffic stop from inside the stopped vehicle also animates this court's conclusion that Helms is entitled to qualified immunity. Each circuit court to analyze an individual's First Amendment right to record a police encounter noted that the right to record a police encounter is not unbounded, and that the right "may be subject to reasonable time, place, and manner restrictions." Turner, 848 F.3d at 690 (quotation omitted); see Fields, 862 F.3d at 353; Gericke, 753 F.3d at 9; Alvarez, 679 F.3d at 605; Glik, 655 F.3d at 84;

[8] See Fields, 862 F.3d at 356 (taking pictures with a camera and iPhone camera); Turner, 848 F.3d at 683–84 ("videotaping"); Gericke, 753 F.3d at 3–4 ("audio and video record[ing]" with a camera); Alvarez, 679 F.3d at 588 ("audio recording"); Glik, 655 F.3d at 79–80 (video recording on cell phone); Smith, 212 F.3d at 1332 ("videotaping"); Fordyce, 55 F.3d at 438 (videotaping).

Smith, 212 F.3d at 1333.[9] Moreover, those circuit courts have explicitly declined to address "the limits of this constitutional right." See, e.g., Fields, 862 F.3d at 360; Turner, 848 F.3d at 690; Gericke, 753 F.3d at 9. Furthermore, the Third Circuit opined that an activity "interfer[ing] with policy activity" such that the recording "put[s] a life at stake" might not be protected. Fields, 862 F.3d at 360.

The Supreme Court has long recognized that police officers face unique dangers during traffic stops. See Rodriguez v. United States, 575 U.S. 348, 356–57 (2015); Arizona v. Johnson, 555 U.S. 323, 330–32 (2009); Maryland v. Wilson, 519 U.S. 408, 413 (1997); Michigan v. Long, 463 U.S. 1032, 1047–48 (1997). "The risk of harm to the police and the occupants of a stopped vehicle is minimized . . . if the officers routinely exercise unquestioned command of the situation." Johnson, 555 U.S. at 330 (quotations omitted); Wilson, 519 U.S. at 414; Michigan v. Summers, 452 U.S. 692, 702–03 (1981). Indeed, during the officers' interaction with Sharpe, Helms stated that Sharpe's recording and real-time broadcasting of the traffic stop from within the stopped car was an "officer safety issue." Pl.'s Ex. A at 17. To be sure, a police officer's "command of the situation" during a traffic stop is not a license to violate the Constitution, including the First Amendment. Nonetheless, the court rejects Sharpe's argument and holds that, on October 9, 2018, during the traffic stop, Sharpe did not have a clearly established First Amendment right to record and real-time broadcast with the ability to interact via messaging applications with those watching in real-time.

---

[9] Only Gericke involved a person recording a traffic stop. See Gericke, 753 F.3d at 7. In Gericke, the person who was recording the interaction was not in the car subject to the traffic stop. Id. Rather, she was in a different car and attempted to record the interaction from a school parking lot adjacent to where the other car was stopped on the street. Id.; cf. Fields, 862 F.3d at 356 (observer on public sidewalk recoding police disperse a house party); Turner, 848 F.3d at 683 (observer on public sidewalk recording a police station); Alvarez, 679 F.3d at 586 (pre-enforcement challenge to Illinois eavesdropping statute in order to prevent Illinois prosecutors from enforcing the eavesdropping statute against people openly recording police officers performing their official duties in public); Glik, 655 F.3d at 79–80 (observer on public sidewalk recording an arrest of another individual).

Thus, qualified immunity bars Sharpe's First Amendment claim against Helms in his individual capacity.[10]

C.

The only claims that remain are Sharpe's official capacity claims against Helms and Ellis under section 1983. Defendants did not move to dismiss Sharpe's claims under section 1983 against Helms and Ellis in their official capacities. Cf. [D.E. 15, 16, 20]. Nonetheless, if Sharpe lacks a legal basis on which to proceed with those claims, the court may address the claims in the interests of judicial economy. See, e.g., Erline Co. S.A. v. Johnson, 440 F.3d 648, 654 (4th Cir. 2006); cf. Grier v. United States, 57 F.3d 1066, 1995 WL 361271, at *1 (4th Cir. 1995) (per curiam) (unpublished table decision) ("Because it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations in [the] complaint, the court would have been warranted in either granting Defendants' motion to dismiss for failure to state a claim or ordering dismissal sua sponte, both under Rule 12(b)(6).").

A claim against a public official sued in his official capacity is "essentially a claim against" the government entity the official represents. Kentucky v. Graham, 473 U.S. 159, 165–66 (1985); Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 307 n.13 (4th Cir. 2006); Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004). Because Sharpe cannot sue WPD, Sharpe's claims against Helms and Ellis in their official capacities are functionally brought against the Town of Winterville. See Compl. at ¶¶ 37–43; Santos v. Frederick Cty. Bd. of Comm'rs, 725 F.3d 451, 469 ("For purposes of section 1983, these official capacity suits [against government officials] are treated as suits against the municipality." (quotation and alteration omitted)); see also Hafer v. Melo, 502 U.S. 21, 25 (1991).

---

[10] This order does not address any First Amendment issue arising from an onlooker who is not within a stopped vehicle from recording and real-time broadcasting a traffic stop on a public road. Cf. Gericke, 753 F.3d at 7.

Municipal entities cannot be held liable under section 1983 solely because they employed a tortfeasor. Rather, when a municipal entity is sued—directly or in an official-capacity suit—the plaintiff must plausibly allege that a "policy or custom" attributable to the municipal entity caused the violation of the plaintiff's federally protected rights. See Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 410 (1997); Hafer, 502 U.S. at 25 (1991); Graham, 473 U.S. at 166; Monell, 436 U.S. 658, 690–94 (1978); King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016); Santos, 725 F.3d at 469–70; Carter v. Morris, 164 F.3d 215, 218–19 (4th Cir. 1999). A violation results from a municipal entity's "policy or custom" if the violation resulted from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell, 436 U.S. at 690–91, 694; see City of St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988).

Not every municipal official's action or inaction represents municipal policy. Rather, the inquiry focuses on whether the municipal official possessed final policymaking authority under state law concerning the action or inaction. See, e.g., McMillian v. Monroe Cty., 520 U.S. 781, 785–86 (1997); Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986); Riddick v. Sch. Bd., 238 F.3d 518, 523 (4th Cir. 2000). Furthermore, even if a section 1983 plaintiff can identify the requisite final policymaking authority under state law, a municipality is not liable simply because a section 1983 plaintiff "is able to identify conduct attributable to the municipality." Riddick, 238 F.3d at 524. Instead, a section 1983 "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Brown, 520 U.S. at 404 (emphasis omitted); see City of Canton v. Harris, 489 U.S. 378, 389–90 (1989); Riddick, 238 F.3d at 524. Thus, to avoid imposing respondeat superior liability on municipalities, a section 1983 plaintiff must show that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Brown, 520 U.S. at 411; see Harris, 489 U.S. at 392; Riddick, 238 F.3d at 524; Carter, 164 F.3d at 218–19.

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action" or inaction. Brown, 520 U.S. at 410. Moreover, even if a section 1983 plaintiff can show the requisite culpability, a section 1983 plaintiff also must show "a direct causal link between the municipal action [or inaction] and the deprivation of federal rights." Id. at 404. Thus, deliberate indifference and causation are separate requirements. See id.

A single act of a municipal official may result in municipal liability if that official has final policymaking authority under state law concerning the act. See Pembaur, 475 U.S. at 481; Lytle v. Doyle, 326 F.3d 463, 472 (4th Cir. 2003); Riddick, 238 F.3d at 523. An official has final policymaking authority if, under state law, the official has final authority "to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." Riddick, 238 F.3d at 523 (quotation omitted); see McMillian, 520 U.S. at 785–86; Lytle, 326 F.3d at 472; Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987).

"[A] municipality is only liable under section 1983 if it causes [a constitutional] deprivation through an official policy or custom." Carter, 164 F.3d at 218; see, e.g., Brown, 520 U.S. at 403–04. This requirement limits municipal liability under section 1983 to those actions for which the municipality is actually responsible by distinguishing between acts attributable to the municipality and acts attributable only to municipal employees. See, e.g., Brown, 520 U.S. at 403–04; Riddick, 238 F.3d at 523. Therefore, a municipality may not be found liable under section 1983 based on a theory of respondeat superior or simply for employing a tortfeasor. See, e.g., Brown, 520 U.S. at 403.

To the extent Sharpe relies on respondeat superior for his claims against Helms and Ellis in their official capacities under section 1983, the Town of Winterville is not liable on that theory. See,

e.g., Brown, 520 U.S. at 403. Accordingly, the court dismisses Sharpe's official capacity claims to the extent that he relies on a theory of respondeat superior.

To the extent Sharpe alleges a Monell claim based on a policy, custom, or practice of the Town of Winterville, the court must first determine whether Sharpe plausibly alleged that Helms and Ellis possess final policymaking authority under state law. See McMillian, 520 U.S. at 785–86; Pembaur, 475 U.S. at 481; Riddick, 238 F.3d at 523. In the complaint, Sharpe alleges that Ellis and Helms acted pursuant to a policy prohibiting recording and real-time broadcasting of police-citizen encounters. See Compl. at ¶¶ 40–41. As alleged, Ellis and Helms implemented the alleged policy, but did not create it. Moreover, under North Carolina law, police officers do not possess final policymaking authority. See, e.g., Glenn-Robinson v. Acker, 140 N.C. App. 606, 631, 538 S.E.2d 601, 618–19 (2000); Rogerson v. Fitzpatrick, 121 N.C. App. 728, 732–33, 468 S.E.2d 447, 450–52 (1996); see also McMillian, 520 U.S. at 785–86; Lytle, 326 F.3d at 472; Riddick, 238 F.3d at 523; Spell, 824 F.2d at 1386. Accordingly, Sharpe cannot base his Monell claim against the Town of Winterville on his single interaction with Helms and Ellis during the traffic stop. See McMillian, 520 U.S. at 785–86; Pembaur, 475 U.S. at 481; Riddick, 238 F.3d at 523.

Given that defendants did not move to dismiss the official capacity claim against the officers, the court will not dismiss the claim against the Town of Winterville. Whether this claim will survive a motion for summary judgment is an issue for another day. Cf. Smith v. Atkins, 777 F. Supp. 2d 955, 966–68 (E.D.N.C. 2011) (granting summary judgment to a municipality on a Monell claim).

IV.

In sum, the court GRANTS defendants' motion to dismiss [D.E. 15] and DISMISSES WITH PREJUDICE plaintiff's claim against WPD and plaintiff's claim against Helms in his individual capacity.

**SO ORDERED. This 20 day of August 2020.**

J. Dever

**JAMES C. DEVER III**
**United States District Judge**