IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

Civil Action No. 4:19-cv-00157

| | |
|---|---|
| **DIJON SHARPE,** | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **PLAINTIFF'S** |
| | ) **MEMORANDUM IN OPPOSITION** |
| | ) **TO DEFENDANTS' MOTION** |
| Officer WILLIAM BLAKE ELLIS, | ) **FOR JUDGMENT ON THE** |
| in his official capacity only; and, | ) **PLEADINGS** |
| Officer MYERS PARKER HELMS IV, | ) |
| in his official capacity only, | ) |
| Defendants. | ) |
| | ) |

**NOW COMES** the Plaintiff Dijon Sharpe ("Mr. Sharpe"), by and through undersigned counsel T. Greg Doucette, and responds to the Defendants' Motion for Judgment on the Pleadings as follows:

### I.  STATEMENT OF THE CASE

At what point, in a free society bound by the rule of law and a written constitution, ought the Government be prohibited from forcibly interfering with the lawful conduct of its people? That question, in the context of a passenger in a vehicle stopped for a minor traffic infraction, lays at the heart of this case.

Plaintiff Dijon Sharpe filed suit against the Winterville Police Department, and its police officers William Blake Ellis ("Officer Ellis") and Myers Parker Helms IV ("Officer Helms"), alleging that point was crossed when Officer Helms attempted to seize his phone in response to him livestreaming their conduct during a traffic stop and Officer Ellis threatened him with arrest if he attempted similar conduct in the future (ECF No. 1).  Mr. Sharpe filed both a Monell claim against the town (naming the police department directly as well as the officers in their official

capacities) and an individual capacity claim against Officer Helms; this Court later concluded the police department was not a proper defendant (ECF No. 33 p. 6), Officer Helms was entitled to qualified immunity on Mr. Sharpe's individual capacity claim (Id. at 13), and Mr. Sharpe's Monell claims were improper to the extent they relied on a theory of *respondeat superior* (Id. at 16). Defendants now move to dismiss what remains of the Monell claim.

## II.  RELEVANT FACTS

Mr. Sharpe was an innocent passenger in a vehicle stopped for a minor traffic infraction. Ver. Compl., ECF No. 1, ¶¶ 19-20. Mr. Sharpe chose to record that interaction on his mobile phone, and to broadcast in real-time – to "livestream" it – using the Facebook Live web application. Id., ¶¶ 22-23. Officer Helms, despite having no reason to suspect Mr. Sharpe of wrongdoing nor to inquire as to Mr. Sharpe's conduct, asked Mr. Sharpe what he was doing on his phone. Id., ¶ 27. Mr. Sharpe not only answered, but did so honestly: he informed Officer Helms that their interaction was being livestreamed. Id., ¶ 28. Officer Helms then assaulted Mr. Sharpe in an effort to seize Mr. Sharpe's phone and prevent him from further broadcasting the conduct of Officer Helms and Officer Ellis. Id. Officer Ellis then advised Mr. Sharpe that he would be jailed if he attempted to livestream police conduct in the future. Id., ¶ 31.

## III.  STANDARD OF REVIEW

In reviewing a motion for judgment on the pleadings, the court "appl[ies] the same standard as a 12(b)(6) motion to dismiss." Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 375 (4th Cir. 2012) (citing Burbach Broad. Co. of Delaware v. Elkins Radio Corp., 278 F.3d 401, 405-06 (4th Cir. 2002)); namely, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570

-2-
Case 4:19-cv-00157-D   Document 39   Filed 12/09/20   Page 2 of 11

(2007)). Plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

Notably, the Court must "accept[] all well-pleaded allegations in the plaintiff's complaint as true and draw[] **all** reasonable factual inferences from those facts in the plaintiff's favor[.]" Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999) (emphasis added).

Moreover, while the Court has no such obligation "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," when such a dismissal – as here – "involves a civil rights complaint, we must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (internal quotation marks and citations omitted). See also Slade v. Hampton Rds. Reg'l Jail, 407 F.3d 243, 248 (4th Cir. 2005) (same); cf. Francis v. Giacomelli, 588 F.3d 186 (4th Cir. 2009) (calling into question whether this special solicitude survives the heightened pleading standard articulated by Twombly / Iqbal); but see Lamar v. Ebert, No. 15-7668 (4th Cir. 2017) (unpublished) (continuing to recognize special solicitude toward civil rights complaints); Rios v. Veale, No. 15-7933 (4th Cir. 2016) (unpublished) (same); Hall v. Burney, No. 11-6566 (4th Cir. 2011) (unpublished) (same); Mccollum ex rel. & v. Snead, No. 5:15-CV-451-BO (E.D.N.C. 2016) (same); Ferrell v. Town of Lillington, No. 5:15-CV-677 (E.D.N.C. 2016) (same).

A well-pled complaint thus must be permitted to proceed "even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Twombly, 550 U.S. at 544.

# IV. ARGUMENT

### A. Under current Fourth Circuit precedent, Mr. Sharpe has sufficiently pled his <u>Monell</u> claim against the Town of Winterville.

In light of the Fourth Circuit's continued recognition that civil rights complaints are due special solicitude at the pleadings stage, Mr. Sharpe has sufficiently pled enough facts to state a claim against the Town of Winterville.

To prevail, Mr. Sharpe must allege sufficient facts to show he was deprived of a constitutional right and that deprivation was committed under color of law. <u>Lytle v. Doyle</u>, 326 F.3d 463, 471 (4th Cir. 2003). He must also show that the deprivation was the result of "official policy or custom." <u>Id.</u> "A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'" <u>Id.</u> (quoting <u>Carter v. Morris</u>, 164 F.3d 215, 217 (4th Cir. 1999).

Mr. Sharpe stipulates that neither Officer Ellis nor Officer Helms are persons with "final policymaking authority," and that he cannot make his <u>Monell</u> claim under the second prong articulated in <u>Lytle</u>.

Nonetheless, a review of either the video or its transcript plausibly suggests the Winterville Police Department has a policy addressing the use of Facebook Live. Mr. Sharpe's mere "[y]eah" in response to it being used was sufficient to instantly trigger Officer Helms to assault Mr. Sharpe in an attempt to seize his phone, and then to insist "[w]e ain't gonna do Facebook Live, because that's an officer safety issue." <u>Verif. Compl.</u>, Ex. A., p. 17. Officer

Ellis then not only reiterated that "we're not gonna have" someone on Facebook Live, but further added that "if you're on Facebook Live, your phone is gonna be taken from you … [a]nd if you don't want to give up your phone, you'll go to jail." Id. at 20. In a back-and-forth exchange with Mr. Sharpe, Officer Ellis goes further to insist that someone would be committing the crime of "RDO" if they do not comply with stopping the use of Facebook Live.[1] Id. at 20-21.

That both officers so readily distinguished between live-streaming and recording during the traffic stop (instantly recognizing that Facebook Live provided the former rather than the latter), and to each then promptly cite officer safety as a concern from its use, strongly suggests that their respective conduct and words stemmed from official policy or training.

It beggars belief that these two well-trained police officers would each independently conclude in a haphazard, freestyle fashion – at nearly the same time – that the use of Facebook Live was "an officer safety issue" that "we're not gonna have" and would lead to criminal liability for "RDO" if someone refused to stop using it. More likely: the Town of Winterville has a policy for how police should address the use of Facebook Live during a traffic stop and has trained its officers accordingly.

At this stage of the proceedings, articulating those facts is sufficient, Mr. Sharpe's job is complete, and he need allege nothing more to survive a motion for judgment on the pleadings. After discovery, it may very well turn out that Winterville *also* has pervasively failed to properly train its officers on the First Amendment, or that its officers' conduct toward Mr. Sharpe is in fact persistent and widespread among the entire force. But under the notice pleading

---

[1] "RDO" is the colloquial term for violating N.C. Gen. Stat. § 14-223, which states "[i]f any person shall willfully and unlawfully resist, delay or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of a Class 2 misdemeanor."

requirements of Twombly / Iqbal, coupled with Fourth Circuit precedent toward civil rights cases, Mr. Sharpe has alleged all he need allege at this time.

### B. Any such municipal livestreaming policy would be unconstitutional.

Defendants recognize the plausibility that the Town of Winterville has a policy governing the use of Facebook Live, because they then make an alternative argument that such a policy would be constitutional if it is found to exist. The Defendants' contentions are wrong.

There is broad consensus among the circuit courts that the First Amendment protects a right to record police in the public performance of their duties. Fields v. City of Phila., 862 F.3d 353 (3rd Cir. 2017) (clearly establishing right to record police, holding "[s]imply put, the First Amendment protects the act of photographing, filming, or otherwise recording police officers conducting their official duties in public"); Turner v. Lieutenant Driver, 848 F.3d 678 (5th Cir. 2017) (clearly establishing right to record police, holding "[w]e conclude that First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions"); Gericke v. Begin, 753 F.3d 1 (1st Cir. 2014) (expanding Glik, infra, to traffic stops and holding "a police order that is specifically directed at the First Amendment right to film police performing their duties in public may be constitutionally imposed only if the officer can reasonably conclude that the filming itself is interfering, or is about to interfere, with his duties"); Am. Civil Liberties Union of Ill. v. Alvarez, 679 F.3d 583 (7th Cir. 2012) (invalidating wiretap statute, holding "the First Amendment limits the extent to which Illinois may restrict audio and audiovisual recording of utterances that occur in public") ; Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011) (finding a "clearly established" right to record police, concluding "[t]he filming of government officials engaged in their duties in a public place, including police

officers performing their responsibilities, fits comfortably within [First Amendment] principles"); Smith v. City of Cumming, 212 F.3d 1332 (11th Cir. 2000) (finding "[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest"); Fordyce v. City of Seattle, 55 F.3d 436 (9th Cir. 1995) (vacating and remanding for trial where genuine issue of fact existed as to whether police "attempt[ed] to prevent or dissuade [Fordyce] from exercising his First Amendment right to film matters of public interest").

Officer Ellis even conceded that "[i]f you were recording, that is just fine." Verif. Compl., Ex. A., p. 20.

The crux of this dispute thus rests on whether "livestreaming" – real-time broadcast of the sort that news stations have engaged in for decades without issue – is a unique evil subject to a categorical ban by the government at the discretion of its police officers. Such a claim is untenable under the First Amendment.

"The proliferation of electronic devices with video-recording capability means that many of our images of current events come from bystanders with a ready cell phone or digital camera rather than a traditional film crew, and news stories are now just as likely to be broken by a blogger at her computer as a reporter at a major newspaper." Glik v. Cunniffe, 655 F.3d 78, 84 (1st Cir. 2011). The "blogger at [his] computer" role was played by Mr. Sharpe in the facts before this court; he was a bystander in a stopped vehicle, unsuspected of wrongdoing, providing images of current events from a computer that fit on the dashboard. The only substantive difference between the bystander in the car here and the bystander outside the car in Glik is the vantage point of the video.

Defendants insist there is a sharp distinction between "recording a law enforcement encounter and posting it online after the fact (which Plaintiff was informed was permissible)" and Mr. Sharpe's conduct, but this claim is incoherent in a world where video can just as effectively be discreetly recorded and uploaded across a cellular network in milliseconds – often without the involvement of the user –as it can be openly livestreamed in milliseconds by a user who confesses to it; there is simply no greater risk to the officer in one case than the other.

This Court distinguished the matter in its order granting Officer Helms qualified immunity, separating livestreaming applications into five categories based on various features of the technology. ECF No. 33, pp. 10-11. But there are no facts in the pleadings that indicate Facebook Live provided Mr. Sharpe's specific geolocation,[2] nor is there any indication – at any time during the stop itself – that Mr. Sharpe interacted with his viewers in a manner that would potentially implicate officer safety concerns. There were no statements, no furtive gestures, and no conduct of any sort that would indicate Mr. Sharpe was sending any messages beyond the passive realtime broadcast of what was taking place from the passenger seat of a stopped car.

And any such policy attempting to limit livestreaming applications during police encounters would all but certainly run afoul of constitutional constraints ranging from the reasonableness of time / place / manner restrictions to issues of overbreadth. For example, is a jogger livebroadcasting their geolocation using the Runkeeper[3] application expected to reach for their watch or phone to stop the application when approached by police? Doing so would likely trigger officer concerns that the person was reaching for a weapon; *not* doing so would provide a

---

[2] Mr. Sharpe did not share his geolocation information; sharing geolocation information is a not a function of Facebook Live, though it is of other features such as "Live Location via Facebook Messenger." See, e.g., the comments to Mr. Sharpe's video (e.g. "Where y'all at") and "Facebook Messenger now lets you privately share your Live Location for an hour," *TechCrunch* (https://techcrunch.com/2017/03/27/facebook-messenger-live-location/) (accessed 9 December 2020).
[3] https://runkeeper.com/

specific geolocation – the place where the jogger was stopped – without any affirmative conduct by the jogger. Likewise for a bicyclist using MapMyRide[4] when stopped by police; without any affirmative conduct of their own, they would be able to provide realtime geolocation data to others, and attempting to stop providing such data would invite an escalated police response.

Is the ACLU's Mobile Justice[5] application verboten for livestreaming to others even though it does not provide a means to interact with them? If no, how is its use meaningfully different from using Facebook Live by a person with no "friends" on the network such that it effectively only provides an archiving function despite the availability of other features?

Is there a legally significant distinction between sending a MMS text message to someone with a "selfie" photograph outside a recognizable location when stopped, compared to texting the same photo with embedded geolocation metadata in it, compared to uploading the same photo to Instagram[6] (no geolocation data but with near-realtime commenting available), compared to uploading the same photo to Discord[7] (no geolocation data but with realtime commenting available via voice)?

How precise a geolocation is "too precise" to be forbidden for use in a traffic stop? After all, Facebook Live currently provides no geolocation data at all, while Twitter's "Go Live!" function can provide varying degrees of location specificity, and Periscope's "Precise Location Sharing" can even provide specific latitude and longitude. Are all such apps to be categorically prohibited? If so, how does such a prohibition comport with reasonable time, place, and manner restrictions or the attendant requirement that such restrictions leave open ample alternative channels for communicating the speaker's message?

---

[4] https://www.mapmyride.com/us/
[5] https://www.aclu.org/issues/criminal-law-reform/reforming-police/mobile-justice
[6] https://www.instagram.com/
[7] https://www.discordapp.com/

And, ultimately, what business at all is it of the Government what a passenger is or is not doing on their phone during a traffic stop when there is no reasonable suspicion to believe the person is engaged in criminal conduct?

Mr. Sharpe recognizes the risk Defendants face when conducting traffic stops, a risk long recognized by our courts. Yet we all find ourselves in a rapidly evolving technological landscape, and the very rapidity-of-change that led this Court to grant qualified immunity to Officer Helms also makes it nigh impossible for the Town of Winterville to have a policy prohibiting the use of livestreaming applications during a traffic stop without violating the Constitution. It is a fool's errand for any municipality to do so, and this Court should not invite further attempts.

## V.  CONCLUSION

Based upon the foregoing, Mr. Sharpe has sufficiently pled a plausible Monell claim against the Town of Winterville, and Defendants' contention that any such municipal policy would be constitutional is incorrect.

Accordingly, the Court should deny the Defendants' Motion for Judgment on the Pleadings.

Respectfully submitted this the     9th    day of                December             , 2020.

                THE LAW OFFICES OF T. GREG DOUCETTE PLLC

                /s/ T. Greg Doucette
                T. Greg Doucette
                North Carolina Bar No. 44351

                ATTORNEYS FOR PLAINTIFF
                311 E. Main Street
                Durham, North Carolina  27701-3717
                Phone: (919) 998-6993
                Fax:    (866) 794-7517
                Email: greg@tgdlaw.com

<b><u>CERTIFICATE OF SERVICE</u></b>

The undersigned has this date served the foregoing **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** upon the Defendants as follows:

**To:** Dan M. Hartzog, Jr., Esq.
Katherine Barber-Jones, Esq.
HARTZOG LAW GROUP, LLP
1903 N. Harrison Avenue, Suite 200
Cary, NC 27513
Email: dhartzogjr@hartzoglawgroup.com
kbarber-jones@hartzoglawgroup.com
*Attorneys for All Defendants*
**Service by:** CM/ECF pursuant to E.D.N.C. Local R. 5.1

This the  9th  day of                December                , 2020.

THE LAW OFFICES OF T. GREG DOUCETTE PLLC


/s/ T. Greg Doucette
T. Greg Doucette
North Carolina Bar No. 44351

ATTORNEYS FOR PLAINTIFF
311 E. Main Street
Durham, North Carolina 27701-3717
Phone: (919) 998-6993
Fax: (866) 794-7517
Email: greg@tgdlaw.com