IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Civil Action No. 4:19-cv-157-D

| | |
|---|---|
| DIJON SHARPE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Officer WILLIAM BLAKE ELLIS, in his official capacity only, and Officer MYERS PARKER HELMS IV, in his official capacity only, | ) **REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS** |
| | ) |
| Defendants. | ) |

COME NOW Defendants, by and through undersigned counsel, and, pursuant to Local Civil Rule 7.1(g)(1), submit this Reply Memorandum in support of their Motion for Judgment on the Pleadings. For the following reasons, as well as the reasons previously stated in Defendants' *Memorandum in Support of Motion for Judgment on the Pleadings*, Defendants respectfully request that their Motion for Judgment on the Pleadings be GRANTED.

## ARGUMENT IN REPLY

I. **PLAINTIFF HAS NOT SUFFICIENTLY PLED HIS *MONELL* CLAIM BECAUSE PLAINTIFF HAS NOT SHOWN PLAUSIBLE ENTITLEMENT TO RELIEF AND A SINGLE ACT FROM OFFICERS CANNOT ESTABLISH AN OFFICIAL POLICY OR CUSTOM.**

Plaintiff, seeming to admit that the likelihood of his prevailing on his claims is "very remote and unlikely," proposes an altered standard of review to the Court to avoid dismissal of his claims. (*See* Plaintiff's Memorandum in Opposition, Doc. 39 (*hereinafter*, "Response") at 3 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). It is well-established that a complaint is subject to dismissal if it fails "to cross the line between possibility and plausibility of entitlement to relief."

*Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Courts must use "judicial experience and common sense" to determine if a plaintiff has shown the plausibility of entitlement to relief. *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." *Id.* It requires the plaintiff to articulate facts, when accepted as true, that "show" that the plaintiff has stated a claim entitling him to relief, i.e., the "plausibility of 'entitlement to relief." *Id.* "[A] plaintiff armed with nothing more than conclusions," cannot "unlock the doors of discovery." *Id.* (quoting *Iqbal* at 697). Indeed, "the test of municipal liability is a most stringent one." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197 (1989).

Plaintiff correctly cites *Veney* to show that, when considering the dismissal of a civil rights complaint, this Court is "especially solicitous" and will not dismiss the complaint "unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002). However, Plaintiff fails to include the very next sentence of the *Veney* Court's statement of the standard for dismissal: "We are not required, however, to accept as true allegations that are merely conclusory, unwarranted deductions or fact, or unreasonable inferences." *Id.* (citation omitted). And, indeed, even in *Veney*, this Court still upheld the dismissal of the civil rights claim alleged.

As Plaintiff's remaining claims against Defendants in their official capacities are considered claims against the municipality, Plaintiff must meet the *Monell* requirements. *See Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105 (1985). Under *Monell*, a plaintiff can only prevail if he can show the defendant acted pursuant to an "official policy or custom."

2

Case 4:19-cv-00157-D   Document 41   Filed 12/23/20   Page 2 of 9

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). Such a policy or custom may arise in one of four ways: (1) an official, express policy, such as a written ordinance or regulation; (2) through the decision of a person with "final policymaking authority," (3) through an omission, such as a failure to properly train officers, that manifests "deliberate indifference" to citizens' rights; or (4) through a practice that is so "persistent and widespread" and "permanent and well settled" that it constitutes "custom or usage with the force of law." *Id.*

Plaintiff stipulates that his claim cannot arise from the decision of a Town official with "final policymaking authority," because Plaintiff's factual allegations concern only Officers Ellis and Helms, who do not have final policymaking authority. (*See* Response at 4). Thus, to proceed on his *Monell* claim, Plaintiff must allege facts making it plausible that the Town had an express policy, an omission manifesting deliberate indifference to citizens' rights, or a practice so persistent and widespread that it had the force of a policy or custom, that caused the alleged constitutional violation. However, Plaintiff's Complaint does not allege that the Town had an official written policy regarding livestreaming, and the facts pled by Plaintiff and reasonable inferences therefrom do not plausibly claim an omission that manifests "deliberate indifference" or a widespread practice that would rise to the standard required for *Monell* liability. It is "well settled that 'isolated incidents' of unconstitutional conduct by subordinate employees are not sufficient to establish a custom or practice for § 1983 purposes." *Lytle*, 326 F.3d at 473 (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)). Likewise, pleading an omission, like lack of training, that shows "deliberate indifference" also requires that policymakers were aware of, and acquiesced in, a <u>pattern</u> of constitutional violations." *Id.*, 326 F.3d at 474 (quoting *Canton v. Harris*, 489 U.S. 378, 397 (1989) (O'Connor, J., concurring in part and dissenting in part)). Undoubtedly, Plaintiff's factual allegations cannot plausibly claim a widespread practice

3

or a pattern of constitutional violations, because the Complaint describes only one isolated incident involving patrol officers. Defendants' single act of preventing Plaintiff from livestreaming his interaction with them is insufficient to plead municipal liability.

Instead, Plaintiff proffers an entirely insufficient argument that the municipality must have a policy because the transcript attached to Plaintiff's Complaint reflects that both officers told Plaintiff, during this incident, that he could not livestream them. (Response at 5). Plaintiff argues that the fact that both officers readily distinguished between livestreaming and recording and cited officer safety as a concern, "strongly suggests that their respective conduct and words stemmed from official policy or training." (*Id.*) Plaintiff further argues that, "It beggars belief that these two well-trained police officers would each independently conclude in a haphazard, freestyle fashion – at nearly the same time – that the use of Facebook Live was 'an officer safety issue' that 'we're not gonna have.'" (*Id.*) Plaintiff's argument is nothing more than speculation, based on the unwarranted assumption that two officers could not possibly both have officer safety concerns related to livestreaming of a traffic stop, an assumption that would require these officers to have no independent understanding or appreciation of the risks associated with traffic stops. It also is based on a faulty premise, entirely ignoring Plaintiff's own video recording, which shows that the officers had went back to their vehicle for an extended period during the traffic stop, and had the opportunity to speak to each other about their concerns over Plaintiff's livestreaming. Indeed, the officers did not actually instruct Plaintiff to stop live recording until approximately 11 ½ minutes into the traffic stop, more than enough time for the officers to discuss their concerns over officer safety due to Plaintiff's livestreaming. (DE 1-2 at 17). This entirely undercuts Plaintiff's assertion that the decision was made in a "haphazard, freestyle fashion." Plaintiff's fundamental argument – that it would not be possible for these officers to have independently concluded that a safety risk

4

was presented by livestreaming a traffic stop, and therefore the Town of Winterville must have a policy in place – is entirely speculative, and falls far short of the *Monell* pleading requirements as set forth above.

In short, Plaintiff comes to this court armed with nothing more than conclusions and speculation. This isolated incident, simply, cannot establish a municipal policy, as required for a claim under *Monell*. Therefore, Plaintiff has failed to meet his burden, and this Court should grant Defendants' motion for judgment on the pleadings.

**II. A POLICY PROHIBITING LIVESTREAMING WOULD NOT BE UNCONSTITUTIONAL BECAUSE PROHIBITING LIVESTREAMING OFFICERS DURING TRAFFIC STOPS WOULD BE A REASONABLE TIME, PLACE, OR MANNER RESTRICTION, AND SUCH A RESTRICTION WOULD NOT BE OVERBROAD.**

It is well established that government entities can reasonably restrict conduct protected by the First Amendment based on time, place, and manner so long as such restrictions are content-neutral, narrowly tailored, and leave open alternative channels of communication. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 790-91 (1989). Here, Plaintiff has not identified or alleged any actual policy on livestreaming implemented by the Town of Sharpsburg, likely because none exists. However, a policy allowing officers to prohibit live-stream encounters when it implicates officer safety would be a reasonable time, place, and manner restriction.

Despite Plaintiff's claim that livestreaming does not "implicate officer safety concerns," even a "passive realtime broadcast" of officers performing their duties may create serious officer safety concerns. Even without livestreams, traffic stops are amongst the most dangerous of police officers' many dangerous duties. *Rodriguez v. United States*, 575 U.S. 348, 356 (2015) ("Traffic stops are especially fraught with danger to police officers."). Livestreams add additional hazards by allowing anyone watching to know where an officer is and what he or she is doing in real time.

5

Depending on the circumstances, an officer could reasonably believe that broadcasting his or her location in real time could dramatically increase the danger of the traffic stop. Indeed, livestreaming could easily turn a routine traffic stop into a crowd-control operation, leaving the officer in an unsafe position.

Furthermore, a prohibition on livestreaming officers during investigative stops leaves open ample alternative channels for communication. Such a restriction would still allow persons to record officers and upload the videos immediately following the interaction. This would be such a *de minimis* restriction as to border on being nonexistent. To the person filming the officers, there is no meaningful distinction between livestreaming and uploading a video the second the officer leaves. To the officers, this delay may be a matter of life and death.

Additionally, Plaintiff argues that this minor time, place, and manner restriction would be overbroad. Plaintiff runs through a litany of social media platforms that he alleges are similar to Facebook Live and would, Plaintiff argues, would (presumably) also be banned. (*See* Response at 8-9). Plaintiff attempts through this strawman argument to show that there can be no distinction between these applications and Facebook Live. However, these claims are simply inaccurate. For instance, Plaintiff discusses the applications Runkeeper and MapMyRide, which both have a feature that can, if activated, broadcast the user's location in real time. According to Plaintiff, if one is using either of these applications and is stopped by the police, one would be violating the livestream restriction without making any affirmative action. This argument is without merit, as an application that merely passively broadcasts one's location—without also uploading audio or video or otherwise broadcasting what one is doing, and importantly, that one is currently interacting with police—is manifestly distinct from live-broadcasting video through an application such as Facebook. Even applications cited by Plaintiff that can broadcast activities in real time,

6

such as Facebook or Mobile Justice, offer livestreaming as an option the user must activate, not as a requirement or a default while using the application. Clearly, such applications are distinguishable and involve a choice by the user to broadcast. Livestream restrictions could easily take into consideration these differences—thereby avoiding concerns of overbreadth.

Plaintiff asks: "What business at all is it of the government what a passenger is or is not doing on their phone during a traffic stop when there is no reasonable suspicion to believe the person is engaged in criminal conduct?" (Response at 10). If what the passenger is "doing on their phone" compromises officer safety, which includes using their phone to broadcast the encounter in real time, the government has a "legitimate and weighty interest" in the passenger's activity. *See, e.g., Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) ("We think it too plain for argument that the State's proffered justification—the safety of the officer—is both legitimate and weighty."); *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (allowing officers to order passengers to get out of the vehicle pending completion of a traffic stop); *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.") (citing *Muehler v. Mena*, 544 U.S. 93, 100-101 (2005)). In short, Plaintiff's arguments concerning the constitutionality of a policy allowing an officer to limit or restrict livestreaming during an investigative stop are without merit. Such a restriction would be a constitutional, content-neutral, time, place, and manner restriction, serving the government's "legitimate and weighty interest" in police officers' safety.

## CONCLUSION

For the reasons set forth herein, as well as the reasons previously set forth in Defendants' *Memorandum in Support of Motion for Judgment on the Pleadings*, this Defendants respectfully

7

Case 4:19-cv-00157-D   Document 41   Filed 12/23/20   Page 7 of 9

request that the Court grant Defendants' Motion for Judgment on the Pleadings and dismiss Plaintiff's remaining claims against Officers Ellis and Helms in their official capacities.

Respectfully submitted, this the **23rd day of December, 2020.**

*/s/ Katherine Barber-Jones*
Dan M. Hartzog, Jr.
N.C. State Bar No. 35330
Katherine Barber-Jones
N.C. State Bar No. 44197
HARTZOG LAW GROUP LLP
1903 N. Harrison Avenue, Suite 200
Cary, NC 27513
Email: dhartzogjr@hartzoglawgroup.com
kbarber-jones@hartzoglawgroup.com
Telephone/Fax: (919) 480-2450
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on **December 23, 2020**, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send electronic notification to all registered CM/ECF participants.

This the **23rd day of December, 2020**.

/s/ *Katherine M. Barber-Jones*
DAN M. HARTZOG, JR.
N.C. State Bar No. 35330
E-mail: dhartzogjr@hartzoglawgroup.com
KATHERINE BARBER-JONES
N.C. State Bar No. 44197
E-mail: kbarber-jones@hartzoglawgroup.com
1903 N. Harrison Avenue, Suite 200
Cary, North Carolina 27513
Telephone: (919) 670-0338
Facsimile: (919) 714-4635
*Attorneys for Defendants*