IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:19-CV-157-D

DIJON SHARPE,

              Plaintiff,

v.

OFFICER WILLIAM BLAKE ELLIS,
in his official capacity, and
OFFICER MYLES PARKER HELMS IV,
in his official capacity,

              Defendants.

**ORDER**

On October 9, 2018, Dijon Sharpe ("Sharpe" or "plaintiff") was a passenger in a car that Town of Winterville police officers William Blake Ellis ("Ellis" or "defendant") and Myers Parker Helms IV ("Helms" or "defendant") properly stopped for a traffic violation. As the police officers approached the car, Sharpe began recording and livestreaming the traffic stop from inside the car. Officer Helms told Sharpe that he could record the traffic stop from inside the car during the traffic stop but not livestream the traffic stop from inside the car during the traffic stop. Sharpe now seeks damages from the officers and the Town of Winterville and contends that the officers and the Town of Winterville violated 42 U.S.C. § 1983 and the First Amendment by only allowing Sharpe to record the traffic stop from inside the car during the traffic stop.

As explained below, assuming without deciding that the First Amendment entitled Sharpe to record the traffic stop from inside the car during the traffic stop, the First Amendment did not entitle Sharpe to livestream the traffic stop from inside the car during the traffic stop. Thus, defendants did not violate the First Amendment, and the court grants defendants' motion for judgment on the pleadings. The court also denies as moot Sharpe's motion for entry of judgment.

I.

Sharpe resides in Pitt County, North Carolina. See Compl. [D.E. 1] ¶ 7. On October 9, 2018, Helms and Ellis, as officers of Winterville Police Department ("WPD"), properly stopped a car for a traffic violation. Sharpe was riding in the front passenger seat of the car. See id. ¶¶ 19–20. While still in the car and during the traffic stop, Sharpe "turned on the video recording function of his smartphone and began livestreaming—broadcasting in real-time—via Facebook Live to his Facebook account." Id. ¶ 22. During the traffic stop, Helms approached the car and asked Sharpe his name, which Sharpe declined to provide. See id. ¶ 24. Helms and Ellis then returned to their patrol car. See id. ¶ 25. When Helms returned to Sharpe's car, he asked Sharpe, "What have we got? Facebook Live, cous?" Id. ¶ 27 (alteration omitted); see Pl.'s Ex. A [D.E. 1-2] 17. Sharpe responded: "Yeah." Pl.'s Ex. A [D.E.1-2] 17; see Compl. ¶ 28. Helms reached into the car through the open window and attempted to grab Sharpe's phone, pulling on his seatbelt and shirt in the process. See Compl. ¶ 28. Helms stated, "We ain't gonna do Facebook Live, because that's an officer safety issue." Pl.'s Ex. A [D.E. 1-2] 17. Later, Ellis remarked: "Facebook Live . . . we're not gonna have, okay, because that lets everybody y'all follow on Facebook [know] that we're out here. There might be just one me next time [sic] . . . It lets everybody know where y'all are at. We're not gonna have that." Id. at 19–20.[1] Ellis continued: "If you were recording, that is just fine . . . . We record, too. So in the future, if you're on Facebook Live, your phone is gonna be taken from you[] . . . [a]nd if you don't want to give up your phone, you'll go to jail." Id. at 20. Towards the end of the stop, Ellis stated, "But to let you know, you can record on your phone . . . but Facebook Live is not gonna happen." Id. at 21.

---

[1] Ellis was correct. See Compl. ¶ 23; https://www.facebook.com/d.r.sharpe/videos/ 2251012878304654/ (last visited Aug. 14, 2020) (listing "Realtime Comments" including, inter alia, "Keep your live on," "It keep pausing," "Where ya'll at," "What kind of bull is going on now," "Did he just grab your phone!???," and "Handle it once it's off"). Sharpe has since deleted the video.

2

In his complaint, Sharpe makes two claims. First, Sharpe alleges a violation of 42 U.S.C. § 1983 and the First Amendment against Helms and Ellis, in their official capacities, and WPD. See Compl. ¶¶ 37–43. As for Helms and Ellis, Sharpe contends that they "physically attacked" him and "threatened to deprive" him of his First Amendment right to record and real-time broadcast his interactions with law enforcement. Id. ¶ 40. As for WPD, Sharpe cites <u>Monell v. Department of Social Services of New York</u>, 436 U.S. 658 (1978), and alleges "an unconstitutional policy, custom, or practice of preventing citizens from recording and livestreaming their interactions with police officers in the public performance of their duties." Id. ¶ 41. Second, Sharpe alleges a violation of section 1983 and the First Amendment against Helms in his individual capacity. See id. ¶¶ 44–48. Specifically, Sharpe asserts that "[t]he physical attack by Officer Helms on Mr. Sharpe" violated the First Amendment. Id. ¶ 47; see [D.E. 19] 6–8.

On February 3, 2020, the defendants moved to dismiss the claims against WPD and against Helms in his individual capacity. See [D.E. 15]. On August 20, 2020, after briefing and oral argument, the court dismissed with prejudice Sharpe's claims against WPD and Helms in his individual capacity, holding that WPD is not an entity that may be sued under North Carolina law and that qualified immunity barred Sharpe's claim against Helms. See [D.E. 33] 4–6, 12–13.

Sharpe's remaining claims are against Helms and Myers in their official capacities (which really means the claims are against the Town of Winterville). Sharpe seeks nominal damages, reasonable attorney's fees, costs, and a declaratory judgment concerning whether during the traffic stop and from inside the stopped car Sharpe "has the right, protected by the First Amendment . . . to both (a) record police officers in the public performance of their duties and (b) broadcast such recording in real-time." Compl. at 8. Defendants seek judgment on the pleadings on Sharpe's remaining claims. See [D.E. 36].

3

II.

A.

A party may move for judgment on the pleadings at any time "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A court should grant the motion if "the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, 442 F.3d 1239, 1244 (10th Cir. 2006) (quotation omitted), abrogated on other grounds by Magnus, Inc. v. Diamond State Ins. Co., 545 F. App'x 750 (10th Cir. 2013) (unpublished); see Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 375 (4th Cir. 2012); Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405–06 (4th Cir. 2002). A court may consider the pleadings and any materials referenced in or attached to the pleadings, which are incorporated by reference. See Fed. R. Civ. P. 10(c); Fayetteville Invs. v. Com. Builders, Inc., 936 F.2d 1462, 1465 (4th Cir. 1991). A court also may consider "matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).

The same standard applies under Rule 12(c) and Rule 12(b)(6). See Mayfield, 674 F.3d at 375; Burbach Broad. Co., 278 F.3d at 405–06. Thus, a motion under Rule 12(c) tests the legal and factual sufficiency of the claim. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 677–80, 684 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–63 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 566 U.S. 30 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008). To withstand a Rule 12(c) motion, a pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (quotation omitted); see Twombly, 550 U.S. at 570; Giarratano, 521 F.3d at 302. In considering the motion, the court must construe the facts and reasonable inferences in the "light most favorable to the [nonmoving party]." Massey v. Ojaniit, 759 F.3d 343, 347, 352–53 (4th Cir. 2014) (quotation omitted); see Clatterbuck v. City of Charlottesville, 708 F.3d 549, 557 (4th Cir. 2013), abrogated on

4

other grounds by Reed v. Town of Gilbert, 576 U.S. 155 (2015); Burbach Broad. Co., 278 F.3d at 406. A court need not accept as true a complaint's legal conclusions, "unwarranted inferences, unreasonable conclusions, or arguments." Giarratano, 521 F.3d at 302 (quotation omitted); see Iqbal, 556 U.S. at 678–79. Rather, a plaintiff's allegations must "nudge[] [his] claims," Twombly, 550 U.S. at 570, beyond the realm of "mere possibility" into "plausibility." Iqbal, 556 U.S. at 678–79.

B.

Sharpe's remaining claims are section 1983 claims against Helms and Myers in their official capacities. To prevail on a section 1983 claim, a plaintiff must show that he was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49–50 (1999); see Thomas v. Salvation Army S. Territory, 841 F.3d 632, 637 (4th Cir. 2016); Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003).

Sharpe's claims against Helms and Myers in their official capacities are really claims against the Town of Winterville. See Kentucky v. Graham, 473 U.S. 159, 165–66 (1985); Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 469 (4th Cir. 2013); Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 307 n.13 (4th Cir. 2006); Love-Lane v. Martin, 355 F.3d 766, 783 (4th Cir. 2004). Accordingly, Sharpe must plausibly allege that a "policy or custom" attributable to the Town of Winterville caused the violation of his federally protected rights. See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997); Hafer v. Melo, 502 U.S. 21, 25 (1991); Graham, 473 U.S. at 166; Monell, 436 U.S. at 690–94; King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016); Santos, 725 F.3d at 469–70.

The court assumes without deciding that Sharpe has plausibly alleged a policy or custom attributable to the Town of Winterville under Monell that prohibited a person during a traffic stop and from inside the stopped car to livestream the traffic stop. Cf. Lytle, 326 F.3d at 471 (detailing the four ways in which liability for a policy or custom may arise). Sharpe, however, still must

5

demonstrate that the alleged policy deprived Sharpe of a right secured by the Constitution or laws of the United States on October 9, 2018. See, e.g., Sullivan, 526 U.S. at 49–50.

Sharpe claims that the Town of Winterville's alleged policy or custom deprived him of his First Amendment right on October 9, 2018. According to Sharpe, during the traffic stop and from inside the stopped car, he possessed a First Amendment right to "record police in the public performance of their duties and to broadcast such recordings in real-time." Compl. ¶ 35 (emphasis added); cf. Pl's Ex. A [D.E. 1-2] 20–21 (recounting that Helms and Meyers told Sharpe he could record, but was not allowed to livestream).

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. The First Amendment's protections extend beyond the text's proscriptions on laws abridging freedom of speech or of the press and encompass "a range of conduct related to the gathering and dissemination of information." Glik v. Cunniffe, 655 F.3d 78, 82 (1st Cir. 2011); see First Nat'l Bank v. Bellotti, 435 U.S. 765, 783 (1978); Stanley v. Georgia, 394 U.S. 557, 564 (1969); Turner v. Lieutenant Driver, 848 F.3d 678, 688–89 (5th Cir. 2017). The First Amendment generally "prohibit[s] the government from limiting the stock of information from which members of the public may draw." First Nat'l Bank, 435 U.S. at 783; see Turner, 848 F.3d at 688. The First Amendment protects a right to gather information "from any source by means within the law." Houchins v. KQED, Inc., 438 U.S. 1, 11 (1978) (quotation omitted); see Glik, 655 F.3d at 82. Gathering information about government officials in a form that can be readily disseminated "serves a cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs." Gericke v. Begin, 753 F.3d 1, 7 (1st Cir. 2014) (quotation omitted); see Mills v. Alabama, 384 U.S. 214, 218–19 (1966); cf. Tobey v. Jones, 706 F.3d 379, 391 (4th Cir. 2013). "Protecting that right of information gathering not only aids in the uncovering of abuses, but also may have a salutary effect on the functioning of government more generally." Gericke, 753 F.3d at 7; see Project Veritas Action Fund v. Rollins, 982 F.3d 813, 831

(1st Cir. 2020), petition for cert. filed, (U.S. May 17, 2020) (No. 20-1598).

Several federal circuit courts have held that the First Amendment generally protects the right to record the police in performing their public duties. See Fields v. City of Phila., 862 F.3d 353, 355–56, 358–60 (3d Cir. 2017) (taking pictures with a camera and iPhone camera); Turner, 848 F.3d at 683–84, 690 (videotaping); Gericke, 753 F.3d at 3–4, 7–9 ("audio-video record[ing]" with a camera); Am. Civ. Liberties Union of Ill. v. Alvarez, 679 F.3d 583, 595–97 (7th Cir. 2012) ("[a]udio recording"); Glik, 655 F.3d at 79–80, 82–83 (video recording on cell phone); Smith v. City of Cumming, 212 F.3d 1332, 1332–33 (11th Cir. 2000) (videotaping); Fordyce v. City of Seattle, 55 F.3d 436, 438 (9th Cir. 1995) (same). This court agrees with that general principle and assumes without deciding that on October 9, 2018, the First Amendment entitled Sharpe to record the traffic stop from inside the car during the traffic stop. However, the United States Court of Appeals for the Fourth Circuit has not yet addressed whether the First Amendment protects the right to record the police in performing their public duties, let alone whether the First Amendment protects the right of a person from inside a stopped car to livestream the police performing a traffic stop. See Szymecki v. Houck, 353 F. App'x 852, 852 (4th Cir. 2009) (per curiam) (unpublished); Hulbert v. Pope, No. SAG-18-00461, 2021 WL 1599219, at *8 (D. Md. Apr. 22, 2021) (unpublished), appeal docketed, No. 21-1608 (4th Cir. May 24, 2021).

Sharpe contends that the cases from other federal circuit courts holding that the First Amendment includes a right to record the police performing their public duties established his right to livestream the traffic stop from inside the stopped car on October 9, 2018. See Compl. ¶¶ 35–36; [D.E. 39] 6–10. These cases, however, do not address, much less resolve Sharpe's claim. Recording a traffic stop for publication after the traffic stop versus livestreaming an ongoing traffic stop from inside the stopped car during the traffic stop are significantly different. See [D.E. 33] 9–11 (describing the significant differences between recording and livestreaming). Indeed, during the traffic stop, Ellis made precisely this distinction. Ellis told Sharpe he could record the traffic stop

7

from inside the stopped car during the traffic stop, but that he could not livestream it. See Pl.'s Ex. A [D.E. 1-2] 19–20. Notably, recording a public interaction with the police preserves that interaction for the recorder's later use. In contrast, livestreaming the interaction from inside the stopped car during the traffic stop contemporaneously broadcasts the interaction to another recipient. Moreover, broadcasting the interaction from inside the stopped car during the traffic stop in real-time with contemporaneous geolocation information conveys both the interaction and the location where it is occurring. Furthermore, contemporaneous messaging allows the individual livestreaming, and those watching, to know the location of the interaction, to comment on and discuss in real-time the interaction, and to provide the perspective from inside the stopped car. The perspective from inside the stopped car, for example, would allow a viewer to see weapons from inside the stopped car that an officer might not be able to see and thereby embolden a coordinated attack on the police. Although Sharpe cites cases recognizing a First Amendment right to record the police performing their public duties, Sharpe cites no authority to support his contention that on October 9, 2018, the First Amendment provided a right to livestream a traffic stop from inside the stopped car during the traffic stop. Cf. [D.E. 39] 6–7.

As mentioned, the Fourth Circuit has not yet recognized a First Amendment right to record police performing their public duties, much less to livestream a traffic stop from inside the stopped car during the traffic stop. Cf. Szymecki, 353 F. App'x at 852. Tellingly, even the federal circuit courts that have recognized a right to record the police performing their public duties have explicitly declined to address "the limits of this constitutional right." Fields, 862 F.3d at 360; see Turner, 848 F.3d at 690; Gericke, 753 F.3d at 7–9. For example, the Third Circuit opined that an activity "interfer[ing] with police activity" such that the recording "put[s] a life at stake" might not be protected. Fields, 862 F.3d at 360. Likewise, the United States District Court for the District of Maryland recognized the First Amendment right to record police performing their public duties, but held that such recording is subject to time, place, and manner restrictions. See Hulbert, 2021 WL

8

1599219, at *8. In light of existing precedent and the differences between recording and livestreaming from inside the stopped car during the traffic stop, the court rejects Sharpe's argument that the First Amendment provided him a right to livestream a traffic stop from inside the stopped car on October 9, 2018. Accordingly, the court holds that Sharpe has failed to allege a deprivation of a right secured by the Constitution or laws of the United States on October 9, 2018. Thus, the court grants defendants' motion for judgment on the pleadings.

Alternatively, Sharpe's claim fails because the alleged policy survives intermediate scrutiny. The validity of Sharpe's section 1983 claim hinges on his allegations that the Town of Winterville has an unconstitutional policy that prohibited Sharpe from livestreaming his encounter with the police officer during the traffic stop from inside the stopped car on October 9, 2018. See Compl. ¶ 41. As alleged, this policy restricted protected speech in public fora, and the court applies the "time, place, and manner doctrine" to determine whether the policy violates the First Amendment. Ross v. Early, 746 F.3d 546, 552 (4th Cir. 2014); see Fields, 862 F.3d at 360; Turner, 848 F.3d at 690; Gericke, 753 F.3d at 7–9; Alvarez, 679 F.3d at 605; Glik, 655 F.3d at 84; Smith, 212 F.3d at 1333. The policy is content-neutral because it is "justified without reference to the content of the regulated speech." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quotation omitted); see Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984). Accordingly, the court analyzes whether the policy is "narrowly tailored to serve a significant governmental interest, and . . . leave[s] open ample alternative channels for communication of the information." Ward, 491 U.S. at 791 (1989) (quotation omitted); see Clark, 468 U.S. at 293; Ross, 746 F.3d at 552. A policy is narrowly tailored if it "promotes a substantial government interest" and "does not burden substantially more speech than is necessary to further the government's legitimate interests." Ross, 746 F.3d at 552–53; see Ward, 491 U.S. at 791, 799; United States v. Albertini, 472 U.S. 675, 689 (1985).

9

The court first determines whether the alleged policy promotes "a substantial government interest." Here, the alleged purpose of the policy is officer and public safety. See Pl.'s Ex. A [D.E. 1-2] 17, 19–20 (Helms and Meyers told Sharpe that he could not livestream from inside the car during the traffic stop because livestreaming threatens officer and public safety).[2] The public has a "paramount interest in officer safety" and public safety. United States v. Stanfield, 109 F.3d 976, 979–80 (4th Cir. 1997); see Wilson, 519 U.S. at 412 (stating that the public interest in officer safety is "both legitimate and weighty" (quotation omitted)); Mahoney v. Sessions, 871 F.3d 873, 882 (9th Cir. 2017). Indeed, this substantial interest in officer and public safety is more pronounced during traffic stops where the Supreme Court repeatedly has recognized that police officers face unique dangers and that those dangers carry over to the public. See Rodriguez v. United States, 575 U.S. 348, 356–57 (2015); Johnson, 555 U.S. at 330–32; Wilson, 519 U.S. at 413–14; Michigan v. Long, 463 U.S. 1032, 1047–48 (1983).

---

[2] "[W]hen it is obvious that a challenged law serves a significant governmental interest, . . . the government [is not required] to produce evidence" demonstrating that the law serves a substantial government interest. Billups v. City of Charleston, 961 F.3d 673, 685 (4th Cir. 2020). Rather, the government may demonstrate a significant interest "by reference to case law." Reynolds v. Middleton, 779 F.3d 222, 228 & n.4 (4th Cir. 2015). Here, the pleadings and case law demonstrate that the Town of Winterville's policy serves its substantial interest in officer and public safety. A review of Sharpe's video indicates that Sharpe's livestreaming from inside the stopped car permitted live broadcast from inside the car of the officers' movements, the perspective from within the stopped car, real-time comments from viewers, and geolocation data. See https://www.facebook.com/d.r.sharpe/videos/2251012878304654/ (last visited Aug. 14, 2020). These features undermine an officer's ability to exercise "command of the" traffic stop, thereby increasing the risks to officers and the public. Arizona v. Johnson, 555 U.S. 323, 330 (2009); see Maryland v. Wilson, 519 U.S. 408, 414 (1997); Michigan v. Summers, 452 U.S. 692, 702–03 (1981); see also United States v. Fager, 811 F.3d 381, 388–89 (10th Cir. 2016) (describing the increased threat of "coordinated attack[s]" on officers in the context of traffic stops); Bureau of Justice Assistance, Developing a Policy on the Use of Social Media in Intelligence and Investigative Activities: Guidance and Recommendations 1 (2013), https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/developing_a_policy_on_the_use_of_social_media_in_intelligence_and_inves.pdf (last visited July 9, 2021) ("Social media sites are increasingly being used to instigate or conduct criminal activity[.]"). Accordingly, the alleged policy serves the substantial government interest of protecting officer and public safety because the policy eliminates a form of individual conduct from inside the stopped car that increases risks to officer and public safety. See Ross, 746 F.3d at 555–56.

Next, the court determines whether the policy "burdens substantially more speech than is necessary to further the government's legitimate interests." Ross, 746 F.3d at 557 (alteration and quotation omitted). To satisfy this standard, the alleged policy need not be "the least restrictive or least intrusive means." Ward, 491 U.S. at 798; see Turner, 848 F.3d at 690; Reynolds, 779 F.3d at 226. "So long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward, 491 U.S. at 800; see Am. Entertainers, L.L.C. v. City of Rocky Mount, 888 F.3d 707, 717 (4th Cir. 2018); Ross, 746 F.3d at 557. Moreover, a policy is not "invalid simply because there is some imaginable alternative that might be less burdensome on speech." Albertini, 472 U.S. at 689.

Viewing the pleadings in the light most favorable to Sharpe, the alleged policy prohibited livestreaming a police encounter from inside the stopped car during the traffic stop. As such, the policy is limited in scope and duration in that it only prohibited livestreaming from inside the stopped car during the traffic stop. Notably, the policy does not ban recording police officers from inside the stopped car during the traffic stop. See Pl.'s Ex. A [D.E. 1-2] 20–21 ("If you were recording, that is just fine . . . . We record, too."). The policy also does not prohibit a person who is not the subject of the traffic stop and who is not inside the stopped car from recording and livestreaming the traffic stop. Accordingly, "[o]n its face, the [p]olicy does no more than target and eliminate the exact source of the evil it seeks to remedy." Ross, 746 F.3d at 557 (alterations and quotations omitted); see Frisby v. Schultz, 487 U.S. 474, 485 (1988). Given the substantial officer and public safety interest, the policy achieves the government's substantial interest by increasing officers' command of those inside the stopped car during the traffic stop by removing features such as live video, real-time commenting, and geolocation data, from being used from inside the stopped car to coordinate an attack on the officers and the public. "[T]herefore, it is apparent that the [policy] directly furthers the [Town's] legitimate governmental interests and that those interests would have

11

been less well served in the absence of the [policy preventing livestreaming]." Ward, 491 U.S. at 801; see Albertini, 472 U.S. at 688–89.[3] Accordingly, the alleged policy is not "substantially broader than necessary to achieve the government's interest." Am. Entertainers, 88 F.3d at 717 (quotation omitted). Thus, the court holds that the Town of Winterville's alleged policy is narrowly tailored to serve a substantial government interest.

Finally, the court analyzes whether the policy leaves open "ample alternative channels for communication of the information." Ward, 491 U.S. at 791; see Ross, 746 F.3d at 559. To satisfy this standard, the available alternatives need not "be the speaker's first or best choice or provide the same audience or impact for the speech." Ross, 746 F.3d at 559 (alteration and quotation omitted); Gresham v. Peterson, 225 F.3d 899, 906 (7th Cir. 2000). Instead, the relevant inquiry focuses on whether the challenged policy "provides avenues for the more general dissemination of a message." Ross, 746 F.3d at 559 (quotation omitted); see Green v. City of Raleigh, 523 F.3d 293, 305 (4th Cir. 2008).

The alleged policy allows Sharpe to record the police encounters from inside the stopped car for later use, such as posting to Facebook a video recorded from inside the stopped car during the traffic stop or submitting the video to media outlets for broadcast. See Pl.'s Ex. A. [D.E. 1-2] 20–21 ("If you were recording, that is just fine. . . . We record, too."). As such, the policy does not "hinder [Sharpe's] ability to disseminate [his] message." Ross, 746 F.3d at 559. The policy also does not

---

[3] Sharpe does not argue that there are less intrusive ways for the Town to achieve its officer and public safety interests. Cf. [D.E. 39] 6–10. Moreover, in light of the concerns associated with livestreaming from inside the stopped car during the traffic stop, there appear to be no less intrusive ways of achieving the public interest in officer and public safety short of barring the use of livestreaming from inside the stopped car during the traffic stop. Accordingly, the court concludes that defendants are not required to present proof that the Town tried other methods to address its officer and public safety concerns in order to demonstrate narrow tailoring. Cf. McCullen v. Coakley, 573 U.S. 464, 494–97 (2014) (requiring the government to present proof that it tried less intrusive methods where less intrusive means were actually available); Reynolds, 779 F.3d at 231–32 (same).

prohibit any person not inside the stopped car from recording and livestreaming the traffic stop. Thus, the policy leaves open ample alternatives of communication. Accordingly, the court holds that the alleged policy survives intermediate scrutiny and that the defendants are entitled to judgment as a matter of law.

C.

Sharpe also moves for entry of final judgment concerning this court's August 20, 2020 order dismissing Sharpe's section 1983 claim against Helms in his individual capacity. See [D.E. 34]; Fed. R. Civ. P. 54(b). In cases involving multiple claims or multiple parties, a "court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). All claims between the parties have been resolved, and the court's judgment is now final. Thus, the court dismisses as moot Sharpe's Rule 54(b) motion.

III.

In sum, the court GRANTS defendants' motion for judgment on the pleadings [D.E. 36] and DISMISSES AS MOOT plaintiff's motion for entry of final judgment [D.E. 34]. The clerk shall close the case.

SO ORDERED. This 9 day of July 2021.

JAMES C. DEVER III
United States District Judge