**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1827

DIJON SHARPE,

Plaintiff – Appellant,

v.

WINTERVILLE POLICE DEPARTMENT; WILLIAM BLAKE ELLIS, in his official capacity only; MYERS PARKER HELMS, IV, in his individual and official capacity,

Defendants – Appellees.

------------------------------------------------------

NATIONAL POLICE ACCOUNTABILITY PROJECT; THE INSTITUTE FOR JUSTICE; AMERICAN CIVIL LIBERTIES UNION; AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA; NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION; THE UNIVERSITY OF VIRGINIA SCHOOL OF LAW FIRST AMENDMENT CLINIC; THE DUKE UNIVERSITY SCHOOL OF LAW FIRST AMENDMENT CLINIC; ELECTRONIC PRIVACY INFORMATION CENTER; ELECTRONIC FRONTIER FOUNDATION; CATO INSTITUTE,

Amici Supporting Appellant.

SOUTHERN STATES POLICE BENEVOLENT ASSOCIATION,

Amicus Supporting Appellees.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Dever III, District Judge. (4:19-cv-00157-D)

Argued: October 27, 2022                    Decided: February 7, 2023

_____

Before NIEMEYER and RICHARDSON, Circuit Judges, and Michael S. NACHMANOFF, United States District Judge for the Eastern District of Virginia, sitting by designation.

_____

Vacated in part, affirmed in part, and remanded by published opinion. Judge Richardson wrote the opinion, in which Judge Nachmanoff joined. Judge Niemeyer wrote an opinion concurring in the judgment.

_____

**ARGUED:** Andrew Tutt, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., for Appellant. Dan M. Hartzog, Jr., HARTZOG LAW GROUP LLP, Raleigh, North Carolina, for Appellees. Joseph Michael McGuinness, THE MCGUINNESS LAW FIRM, Elizabethtown, North Carolina, for Amicus The Southern States Police Benevolent Association. **ON BRIEF:** T. Greg Doucette, THE LAW OFFICES OF T. GREG DOUCETTE PLLC, Durham, North Carolina; Jing Wang, Palo Alto, California, John A. Freedman, David McMullen, Washington, D.C., Isaac Ramsey, ARNOLD & PORTER KAY SCHOLER LLP, San Francisco, California, for Appellant. Katherine M. Barber-Jones, HARTZOG LAW GROUP LLP, Raleigh, North Carolina, for Appellees. Lauren Bonds, NATIONAL POLICE ACCOUNTABILITY PROJECT, New Orleans, Louisiana; J. Christopher Mills, J. CHRISTOPHER MILLS, LLC, Columbia, South Carolina; David Milton, Boston, Massachusetts, for Amicus National Police Accountability Project. Victoria Clark, Austin, Texas, William Aronin, INSTITUTE FOR JUSTICE, Arlington, Virginia, for Amicus The Institute for Justice. Vera Eidelman, Carl Takei, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York; Irena Como, Kristi Graunke, AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA, Raleigh, North Carolina, for Amici American Civil Liberties Union and American Civil Liberties Union of North Carolina. Mickey H. Osterreicher, Buffalo, New York, Alicia Wagner Calzada, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, San Antonio, Texas; Lin Weeks, Gabriel Rottman, Ian C. Kalish, First Amendment Clinic, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia; Sarah Ludington, First Amendment Clinic, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina, for Amici National Press Photographers Association, the University of Virginia School of Law First Amendment Clinic, and the Duke University School of Law First Amendment Clinic. Megan Iorio, Jake Weiner, ELECTRONIC PRIVACY INFORMATION CENTER, Washington, D.C., for Amicus Electronic Privacy Information Center. Sophia Cope, Mukund Rathi, ELECTRONIC FRONTIER FOUNDATION, San Francisco, California, for Amicus Electronic Frontier Foundation. Clark M. Neily III, Jay R. Schweikert, CATO INSTITUTE, Washington, D.C., for Amicus The Cato Institute.

_____

2

RICHARDSON, Circuit Judge:

This case asks whether a town's alleged policy that bans video livestreaming certain interactions with law enforcement violates the First Amendment. It also asks whether a police officer who, during a traffic stop, attempted to stop a passenger from livestreaming the encounter may be successfully sued under § 1983 for violating the passenger's First Amendment rights.

On the first question, Defendants have thus far failed to establish that the alleged livestreaming policy is sufficiently grounded in, and tailored to, strong governmental interests to survive First Amendment scrutiny. So we vacate the district court's order declaring the policy constitutional and remand for further proceedings. But on the second question, we affirm the district court's order holding that qualified immunity protects the officer. When the stop occurred, it was not clearly established that the officer's actions violated the passenger's First Amendment rights. So qualified immunity bars that claim.

## I.    Background

Officer Myers Helms of the Winterville Police Department tried to stop passenger Dijon Sharpe from livestreaming his own traffic stop. [J.A. 9–10, 34–35.] Sharpe started streaming to Facebook Live shortly after the car he was riding in was pulled over. [J.A. 9.] Officer Helms noticed this activity and attempted to take Sharpe's phone, reaching through Sharpe's open car window. [J.A. 9, 55, 75.] Officer Helms and his partner Officer William Ellis then told Sharpe he could record the stop but could not stream it to Facebook Live because that threatened officer safety. The officers also made it clear that if Sharpe

3

tried to livestream a future police encounter, he would have his phone taken away or be arrested.[1]  [J.A. 9–10, 34–35.]

Sharpe sued under 42 U.S.C. § 1983.  He sued the officers in their official capacities—effectively suing the Town of Winterville—for allegedly having a policy that prohibits recording and livestreaming public police interactions in violation of the First Amendment.[2]  [J.A. 10.]  He also sued Officer Helms in his individual capacity.  [J.A. 11.]  The district court awarded Defendants judgment on the pleadings after finding that the policy, as alleged, did not violate the First Amendment.[3]  [J.A. 78–86.]  And the court dismissed the individual-capacity claim against Officer Helms as barred by qualified immunity.  [J.A. 59–66.]

## II.  Discussion

Sharpe plausibly alleges that the Town of Winterville has a policy preventing someone in a stopped vehicle from livestreaming their traffic stop.  If that policy exists, it reaches protected speech.  So to survive First Amendment scrutiny, the Town needs to

---

[1] When asked whether this was a law, Officer Ellis responded, "That's the RDO," J.A. 34, likely referring to N.C. Gen. Stat. Ann. § 14-233, a statute that criminalizes "resisting, delaying, or obstructing" an officer.

[2] *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. New York City Dept. of Soc. Ser's.*, 436 U.S. 658, 690 n.55 (1978))).  Sharpe also sued the Winterville Police Department.  [J.A. 10.]  But the district court dismissed this claim, finding the Winterville Police Department could not be sued under North Carolina law.  [J.A. 57–59.]  Sharpe has not appealed this dismissal.

[3] We use "Defendants" to refer to the officers in their official capacities and, effectively, the Town.

4

justify the alleged policy by proving it is tailored to weighty enough interests. The Town has not yet met that burden. So Sharpe's claim that the Town's livestreaming policy violates the First Amendment survives.

Sharpe also appeals the district court's dismissal of his individual-capacity claim against Officer Helms. He asserts that it was clearly established that Officer Helms's actions violated his First Amendment rights. So, he says, Officer Helms is not immune. We disagree. At the time of Sharpe's traffic stop, it was not clearly established that the First Amendment prohibited an officer from preventing a passenger who is stopped from livestreaming their traffic stop. Officer Helms is therefore entitled to qualified immunity, and Sharpe's individual-capacity claim was properly dismissed.

## A.    Sharpe Plausibly Alleges a First Amendment Violation

For his claim against the Town to survive the pleading stage, Sharpe need only plausibly allege (1) that the Town has a policy preventing a passenger from livestreaming their traffic stop and (2) that such a policy violates his First Amendment rights.[4] He has done so.

---

[4] At this stage of the litigation, we are merely testing the sufficiency of the complaint, not resolving its merits or any factual disputes. *See Massey v. Ojaniit*, 759 F.3d 343, 353 (4th Cir. 2014). So long as Sharpe has pleaded enough facts that, when assumed to be true, state a plausible First Amendment violation, then his official-capacity claim should survive Defendants' Rule 12(c) challenge. *See id.; Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 403 (4th Cir. 2014) ("Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier . . . The recitation of facts need not be particularly detailed, and the chance of success need not be particularly high.").

5

Sharpe must first plausibly allege that the Town has a policy or custom barring a car's occupant from livestreaming their traffic stop. The Town, as a local government, is only "liable under § 1983 for its own violations of federal law." *Los Angeles Cty. v. Humphries*, 562 U.S. 29, 36 (2010). So unless Sharpe's alleged injury came from executing a Town "policy or custom," the Town cannot be sued under § 1983. *Monell*, 436 U.S. at 694 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

Sharpe has alleged that the Town has a policy that prohibits an occupant from livestreaming their own traffic stop. And Sharpe's allegation is plausible.[5] He supports

---

[5] Sharpe alleges a broader policy that prevents both "recording and livestreaming" and reaches all public interactions with police. J.A. 11. Yet it is implausible that the Town's policy prevents recording without livestreaming. The officers made it clear that Sharpe was free to record, he just could not livestream. So he has plausibly alleged a policy that bars livestreaming, but not one that bars only recording. He thus lacks standing to seek, as he does, a declaration that "he has a First Amendment-protected right to record police officers in the public performance of their duties." J.A. 11; *see Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021). And while he may plausibly allege that the policy reaches all public interactions, we know that if the policy exists it covers Sharpe's circumstances. Since that is enough for Sharpe to prevail here, that is the only scenario we consider.

Additionally, Sharpe's complaint technically alleges that the Winterville Police Department has this alleged policy and not the Town. [J.A. 11.] But *Monell* liability, by definition, requires that the policy be attributable to the municipality itself—including via an individual or entity that has final policymaking authority for the municipality. *See Santos v. Frederick Cnty. Bd. of Comm'rs*, 725 F.3d 451, 469–70 (4th Cir. 2013); *Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022). And Sharpe (Continued)

6

his allegation by asserting: (1) Officer Helms tried to seize his phone upon learning Sharpe was streaming to Facebook Live; (2) Officer Ellis said that in the future if Sharpe broadcasts on Facebook Live his phone will be taken from him and, if Sharpe refuses to give up his phone, he will go to jail; and (3) both officers justified their efforts to prevent livestreaming using the same officer-safety rationale. It is a reasonable inference that absent a policy the two officers would not have taken the same course, for the same reason, nor would those officers have known in advance that Sharpe would face the same treatment if he tried to livestream another officer in the future. S*ee Mays v. Sprinkle*, 992 F.3d 295, 299 (4th Cir. 2021) (reminding us that at this stage we must draw "all reasonable factual inferences in plaintiff's favor").[6]

But plausibly alleging a policy is not enough. The policy that Sharpe alleges must also violate the First Amendment. In other words, livestreaming one's own traffic stop must be protected speech, and barring it must impermissibly abridge that speech. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Wood v. Moss*, 572 U.S. 744, 757 (2014).

---

brings a *Monell* claim challenging the Police Department's policy. So he is really alleging that the Winterville Police Department's allegedly unconstitutional policy is attributable to the Town. *See Spell v. McDaniel*, 824 F.2d 1380, 1394–95 (4th Cir. 1987) (assessing whether a police chief was a final policymaker for *Monell* liability).

[6] That Officer Ellis seemingly claimed to be acting under North Carolina's statute prohibiting resisting, delaying, or obstructing an officer does not change this analysis. Even if Officer Ellis thought his authority to seize Sharpe's phone or arrest him came from this statute, it is still a plausible inference that he could only know the statute would enable these sanctions if there was a policy to prevent livestreaming. To know in advance that livestreaming would be treated as obstruction or that Sharpe would be ordered to stop livestreaming and so face arrest for resisting that order still suggests that there is a policy against livestreaming.

7

Sharpe bears the burden to show that his protected speech was restricted by governmental action. *See Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015). The burden then shifts to the government to prove the speech restriction is constitutionally permissible. *Id.*

Sharpe has met his initial burden by showing that the alleged policy restricts his protected speech. Creating and disseminating information is protected speech under the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). "'[A] major purpose of' the First Amendment 'was to protect the free discussion of governmental affairs.'" *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam)). And other courts have routinely recognized these principles extend the First Amendment to cover recording—particularly when the information involves matters of public interest like police encounters. *See, e.g.*, *Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021) ("The act[] of . . . recording videos [is] entitled to First Amendment protection because [it is] an important stage of the speech process that ends with the dissemination of information about a public controversy."). We agree. Recording police encounters creates information that contributes to discussion about governmental affairs. So too does livestreaming disseminate that information, often creating its own record. We thus hold that livestreaming a police traffic stop is speech protected by the First Amendment.

But not all regulation of protected speech violates the First Amendment. The burden now flips to Defendants. And the Town's speech regulation only survives First Amendment scrutiny if Defendants demonstrate that: (1) the Town has weighty enough

interests at stake; (2) the policy furthers those interest; and (3) the policy is sufficiently tailored to furthering those interests. *See Reynolds*, 779 F.3d at 228–29.[7]

To meet this burden here, Defendants may point to common sense and caselaw to establish that the Town has a valid interest, and can rely on any "obvious" connection between the asserted interest and the challenged regulation to show that their policy was appropriately "tailored" to that interest. *See id.* at 227–228, 228 n.4. But "mere conjecture" is inadequate to carry their burden. *See Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 392 (2000). Defendants must demonstrate that the Town's policy passes First Amendment scrutiny or else Sharpe's allegation is plausible and his claim survives at this stage. *See McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 211 (2014) (reversing dismissal of First Amendment claim because government had "not carried its burden of demonstrating" its regulation furthered its asserted interest).[8]

---

[7] The exact formulation of how weighty these interests must be varies according to what type of regulation is at issue. *Compare Am. Ass'n of Pol. Consultants, Inc. v. FCC*, 923 F.3d 159, 167 (4th Cir. 2019) (content-based restrictions are upheld only if "narrowly tailored to further a compelling governmental interest"), *with City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 142 S. Ct. 1464, 1475–76 (2022) (content-neutral restrictions are upheld only if "narrowly tailored to serve a significant governmental interest" (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989))). But the burden remains on the government regardless of the regulation's classification.

[8] *See also Billups v. City of Charleston*, 961 F.3d 673, 690 (4th Cir. 2020) (declaring speech restriction unconstitutional after a bench trial because government "failed to provide evidence" of sufficient tailoring); *Indep. News, Inc. v. City of Charlotte*, 568 F.3d 148, 157 (4th Cir. 2009) (upholding grant of partial judgment on the pleadings because government had a "sufficient evidentiary basis" to justify speech restriction); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 515 (4th Cir. 2002) (affirming in part preliminary injunction because government "produced no evidence" speech restriction furthered its interest).

9

The Town purports to justify the policy based on officer safety. [Appellees' Response Brief at 55.] According to Defendants, livestreaming a traffic stop endangers officers because viewers can locate the officers and intervene in the encounter. [J.A. 9.] They support this claim by arguing, with help from amici, that violence against police officers has been increasing—including planned violence that uses new technologies. [*See, e.g.*, Amicus Brief of the Southern States Police Benevolent Association at 9.] On Defendants' view, banning livestreaming prevents attacks or related disruptions that threaten officer safety.

This officer-safety interest might be enough to sustain the policy. But on this record we cannot yet tell. There is "undoubtedly a strong government interest" in officer safety. *Riley v. California*, 573 U.S. 373, 387 (2014). And risks to officers are particularly acute during traffic stops. *See Maryland v. Wilson*, 519 U.S. 408, 414 (1997); *Michigan v. Long*, 463 U.S. 1032, 1047 (1983).[9] But even though the Town has a strong interest in protecting

---

[9] Our citation to Fourth Amendment caselaw throughout this opinion does not mean that Fourth Amendment standards determine the outcome.

Government action may pass scrutiny under the Fourth Amendment but still offend the First. *See, e.g.*, *Trulock v. Freeh*, 275 F.3d 391, 403–06 (4th Cir. 2001) (holding that officer-defendants enjoyed qualified immunity on Fourth Amendment claims but not First Amendment claims). The Fourth and First Amendments do not *authorize* government actions. They *limit* them. So finding that certain police intrusions on liberty comply with the Fourth Amendment does not bless those actions as permissible restraints on speech. *See Tobey v. Jones*, 706 F.3d 379, 390 n.5 (4th Cir. 2013) (finding "no authority for [the] argument that government action that is reasonable within the meaning of the Fourth Amendment is necessarily therefore reasonable for purposes of First Amendment analysis").

At the same time, the governmental interests relevant to a Fourth Amendment inquiry can be relevant to a First Amendment inquiry. *See Sause v. Bauer*, 138 S. Ct. 2561, 2562–63 (2018) (per curiam) (illustrating that Fourth Amendment interests can be critical (Continued)

its officers, Defendants have not done enough to show that this policy furthers or is tailored to that interest. Nor is that gap filled here by common sense or caselaw. *See Reynolds*, 779 F.3d at 228–29. So we cannot conclude, at this stage, that the policy survives First Amendment scrutiny. *See Billups*, 961 F.3d at 687.[10] Instead, we hold that Sharpe has plausibly alleged that the Town adopted a livestreaming policy that violates the First Amendment.

### B.    Officer Helms is Entitled to Qualified Immunity

Having determined that the official-capacity claim against the Town must survive, we turn to the individual-capacity claim against Officer Helms. When a government official is sued in their individual capacity, qualified immunity protects them "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To determine whether qualified immunity applies, we ask both "whether a constitutional violation occurred" and "whether the right violated was clearly established" at the time of the official's conduct. *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010).

---

to resolving First Amendment questions); *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972) (recognizing that sometimes there can be "a convergence of First and Fourth Amendment values"). And here the interests that animate some Fourth Amendment cases bear on the governmental interest in this First Amendment arena.

[10] At this stage, the claim survives whether the policy is content-neutral or content-based. So we need not decide whether the district court properly found the policy to be content neutral and applied intermediate scrutiny. On remand, the district court will be able to consider the policy's nature as more information about it is revealed.

A right can be clearly established by cases of controlling authority in this jurisdiction or by a consensus of persuasive authority from other jurisdictions. *Owens ex rel. Owens v. Lott*, 372 F.3d 267, 280 (4th Cir. 2004). Either way, these sources "must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)). This standard does not require "a case directly on point." *Id.* But the right's contours must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Cannon v. Vill. of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018) (quoting *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006)).

So we must define the right at issue with specificity. *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). And the particulars matter. A reasonable officer will be unable to "determine how the relevant legal doctrine . . . will apply to the factual situation" if the circumstances differ too much from prior cases. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001)).

The First Amendment right here is a passenger's alleged right to livestream their own traffic stop. And there is no "controlling authority" in this jurisdiction that establishes Sharpe had this right when his car was pulled over. *See Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017). Sharpe's attempt to construct such controlling authority fails. He cites an array of cases from various contexts, including from election law, *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721 (2011), access to the courts, *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), and medical data,

12

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011). These cases provide general guidance about First Amendment doctrine. But they offer no concrete direction to the reasonable officer tasked with applying that doctrine to the situation Officer Helms confronted. So they do not clearly establish the specific right at issue. *See Mullenix*, 577 U.S. at 12.

Nor is there any consensus of persuasive authority to establish this right. *See Lott*, 372 F.3d at 280. None of Sharpe's out-of-jurisdiction case citations address a passenger livestreaming a police officer during their own traffic stop. Instead, they generally are about video recordings, not livestreams. *See, e.g.*, *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017) (discussing the "right to record the police"). And the people doing the recording tend to be bystanders, not the subjects of the stop itself. *See, e.g.*, *Fields v. City of Philadelphia*, 862 F.3d 353, 359–60 (3d Cir. 2017) (discussing "bystander videos").

Here, those two distinctions make all the difference. The constitutionality of a speech restriction rests on balancing interests. A different balance is struck when an officer prevents a bystander from recording someone else's traffic stop than when the officer prevents a passenger from livestreaming their own stop. *See, e.g.*, *Long*, 463 U.S. at 1047–48 (explaining that officers often face increased risk during traffic stops from passengers in the stopped vehicles); J.A. 34 (officers asserting that livestreaming was more dangerous to law enforcement than recording). Without a consensus of cases barring the latter, Sharpe

13

cannot show that a reasonable official in Officer Helms's shoes would understand that his actions violated the First Amendment. *See Cannon*, 891 F.3d at 497.[11]

Qualified immunity protects Officer Helms unless it was clearly established at the time of the traffic stop that forbidding a passenger from livestreaming their own traffic stop violated the First Amendment. Here, no precedent in this Circuit nor consensus of authority from the other Circuits established that Officer Helms's actions were unconstitutional. The district court was thus correct to dismiss the § 1983 claim against him in his individual capacity.

*   *   *

Plaintiffs seeking redress under § 1983 for a violation of their constitutional rights must walk through a narrow gate. The doctrines of qualified immunity and *Monell* liability for local governments substantially diminish their chances. Both doctrines are controversial. They have been criticized for being atextual, ahistorical, and driven by policy considerations.[12] But they are also binding.

---

[11] For the same reason, we cannot accept Sharpe's attempt to broadly define the right as "a First Amendment right to film police in the discharge of their duties in public" that "ha[s] no blanket carve-out for vehicle passengers and no special exception for live broadcasting." Appellant's Reply at 1. Such framing contravenes the Supreme Court's admonition to avoid defining the right at too high a level of generality. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

[12] For criticism of qualified immunity, *see, e.g.*, *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1870–72 (2017) (Thomas, J., concurring in part and concurring in the judgment); William Baude, *Is Qualified Immunity Unlawful*, 106 CAL. L. REV. 45 (2018). For criticism of *Monell* liability, *see, e.g.*, *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 835–38 (Stevens, J., dissenting); David H. Gans, *Repairing Our System of Constitutional Accountability: Reflections on the 150th Anniversary of Section 1983*, 2022 CARDOZO L. REV. DE NOVO (Continued)

14

Here, faithful application of the doctrines leads to divergent results. On the one hand, Sharpe's official-capacity claim can proceed. He has sufficiently alleged that the Town has a policy barring livestreaming one's own traffic stop that violates the First Amendment. He must now show this policy exists. And, if it does, the Town will have the chance to prove that it does not violate the First Amendment. On the other hand, although Officer Helms was allegedly acting under the policy that plausibly violates the First Amendment, Sharpe's claim against him in his personal capacity fails. It was not clearly established that Officer Helms's actions violated Sharpe's First Amendment rights and so he is protected by qualified immunity.

*VACATED IN PART,*
*AFFIRMED IN PART,*
*AND REMANDED.*

---

90, 108–14 (2022). A more textual and historical analysis of § 1983 may still yield some protection for officials and municipalities. *See, e.g.*, David Jacks Achtenberg, *Taking History Seriously: Municipal Liability Under 42 U.S.C. § 1983 and the Debate over Respondeat Superior*, 73 FORDHAM L. REV. 2183, 2185–86 (2005); Larry B. Kramer & Alan O. Sykes, *Municipal Liability under 1983: A Legal and Economic Analysis*, 1987 SUP. CT. REV. 249, 262 (1987); Aaron L. Nielson & Christopher J. Walker, *A Qualified Defense of Qualified Immunity*, 93 NOTRE DAME L. REV. 1853, 1864–70 (2018).

15

NIEMEYER, Circuit Judge, concurring in the judgment:

I agree with the holding of the majority opinion that Officer Myers Helms is entitled to qualified immunity. I also agree that a remand is in order to determine whether the Town of Winterville had a policy prohibiting livestreaming by persons detained and, if it did, whether the policy is unconstitutional. I write separately because the majority opinion hardly acknowledges the role of the Fourth Amendment in the relevant analysis and the relationship of the Fourth Amendment to other constitutionally protected rights, including First Amendment rights. Yet, the issues in this case arose in the context of a lawful Fourth Amendment seizure — a traffic stop — during which a person seized refused to obey the order of law enforcement officers to cease using a cell phone to communicate with others during the course of the stop. The restriction on cell-phone use *was thus an aspect of the seizure*, and therefore the lawfulness of the restriction is regulated by the Fourth Amendment and its jurisprudence recognizing that, when conducting traffic stops, law enforcement officers may intrude on the liberty interests of those who have been stopped, so long as the intrusion is *reasonable*.

The issue therefore should be restated, I submit, to whether, during a lawful traffic stop, law enforcement officers may lawfully prohibit the person detained from conducting electronic communications with others. This is a nuanced, but meaningful, adjustment to the issue addressed in the majority opinion, which is whether restrictions on electronic communications of persons detained are justified under a traditional, free-standing First Amendment analysis. While the two analyses might, but need not, lead to the same conclusion, I believe that we should apply the reasonableness test of the Fourth

16

Amendment because the restrictions about which the plaintiff complains were imposed as a part of a lawful Fourth Amendment seizure.

I

The factual context is routine but is important to demonstrate my point. On October 9, 2018, Officer William Ellis and Officer Helms conducted a lawful traffic stop of a vehicle driven by Juankesta Staton, in which Dijon Sharpe was a passenger. At the beginning of the stop, Sharpe, as alleged in his complaint, "turned on the video recording function of his smartphone and began livestreaming — broadcasting in real-time — via Facebook Live to his Facebook account," which reached a live audience and provoked live responses. One viewer posted, "Be Safe Bro!" and another asked, "Where y'all at." Other comments included "SWINE" and "They don't like you Dijon." Those viewing the livestream could hear Staton say that the police had been following them for some time and that they had been racially profiled — that the officers had "seen two black people, and . . . [t]hey thinking drug dealer. . . . That's called harassment."

During the stop, Officer Helms told Sharpe, "We ain't gonna do Facebook Live, because that's an officer safety issue." At the same time, he attempted to grab Sharpe's phone, but Sharpe moved it further inside the vehicle, out of Helms's reach, and stated, apparently to his Facebook Live audience, "Look at your boy. Look at your boy." Officer Ellis then addressed Sharpe's livestreaming, stating to both Staton and Sharpe, "In the future, guys, this Facebook Live stuff, . . . we're not gonna have, okay, because that lets everybody y'all follow on Facebook [know] that we're out here. There might be just one

17

[officer] next time . . . [and] [i]t lets everybody know where y'all are at.  We're not gonna have that."  Officer Ellis continued, "If you were recording, that is just fine. . . .  We record, too," but "in the future, if you're on Facebook Live, your phone is gonna be taken from you, . . . [a]nd if you don't want to give up your phone, you'll go to jail."  When Staton explained that Sharpe was using Facebook Live because they didn't "trust . . . cops," Officer Ellis sympathized with the concerns, but nonetheless reiterated, "[Y]ou can record on your phone . . . but Facebook Live is not gonna happen."

A little over a year after the stop, Sharpe commenced this action under 42 U.S.C. § 1983 against the Winterville Police Department and both officers, alleging that the defendants had violated his First Amendment rights by seeking to enforce a prohibition against livestreaming during traffic stops.  On the defendants' motion, the district court dismissed Sharpe's claim against Officer Helms in his individual capacity on the ground that Helms was entitled to qualified immunity, explaining that "Sharpe's right to record and real-time broadcast his encounter with police" while he was "a passenger in a stopped vehicle" was not "clearly established on October 9, 2018."  The court also dismissed Sharpe's claims against the officers in their official capacities, concluding that the First Amendment did not entitle an individual who was the subject of a lawful Fourth Amendment seizure to livestream the stop while it was in process.

II

The narrow activity on review before us is an officer's prohibiting a person detained from livestreaming the encounter while detained.  And with respect to the individual-

18

capacity claim against Officer Helms, we must ask whether every reasonable officer would know that imposing such a restriction as part of the seizure made during a traffic stop was unlawful, *i.e.*, whether clearly established law made it so. *See, e.g.*, *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). That question can be addressed only in the context of what a reasonable officer knows about the broader activity from clearly established law and whether, during a traffic stop, he can take control of the situation by imposing certain restrictions for purposes of officer safety, including restrictions on electronic communications.

At the time of the traffic stop in this case, it was clearly established to every reasonable police officer that when an officer conducts a traffic stop, "everyone in the vehicle" is seized within the meaning of the Fourth Amendment, "'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). A reasonable officer also knew that "whenever police officers use their authority to effect a stop, they subject themselves to a risk of harm." *United States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017) (en banc). Traffic stops in particular, the Supreme Court has long emphasized, are "especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977) (recognizing the "inordinate risk confronting an officer as he approaches a person seated in an automobile"). "[T]he risk of a violent encounter in a traffic-stop setting 'stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.'" *Arizona v.*

19

*Johnson*, 555 U.S. 323, 331 (2009) (quoting *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)).  And when a traffic stop involves one or more passengers, that fact only "increases the possible sources of harm to the officer," as "the motivation of a passenger to employ violence . . . is every bit as great as that of the driver."  *Wilson*, 519 U.S. at 413, 414.

Every reasonable officer also knew at the time of this stop that to lower the risk inherent in all traffic stops, the officer is authorized to "*routinely exercise unquestioned command of the situation*."  *Wilson*, 519 U.S. at 414 (emphasis added) (quoting *Michigan v. Summers*, 452 U.S. 692, 703 (1981)); *see also Johnson*, 555 U.S. at 330.  To this end, clearly established law informed officers that they may take reasonable steps to protect themselves during traffic stops, *even if such steps intrude on the liberty interests* of those who have been stopped.  For instance, the Supreme Court has held that "as a matter of course," police officers may order the driver and all passengers of a lawfully stopped vehicle "to get out of the car pending completion of the stop," reasoning that the government's "legitimate and weighty" interest in "officer safety" outweighs the "minimal" "additional intrusion" that such an order imposes on the vehicle's occupants. *Wilson*, 519 U.S. at 410, 412, 415 (cleaned up); *see also Johnson*, 555 U.S. at 331–32.  It has also held that police officers may frisk *any occupant* of the stopped vehicle whom the officer reasonably suspects of being armed and dangerous, precisely because the vehicle's occupants, unlike any nearby bystanders, are subject to "a lawful investigatory stop." *Johnson*, 555 U.S. at 327; *see also Robinson*, 846 F.3d at 696 ("[A]n officer who makes a lawful traffic stop and who has a reasonable suspicion that one of the automobile's occupants is armed may frisk that individual for the officer's protection and the safety of

20

everyone on the scene").  Similarly, it has held that "an officer [may] search a vehicle's passenger compartment when he has reasonable suspicion that an individual . . . is 'dangerous' and might access the vehicle to 'gain immediate control of weapons.'" *Arizona v. Gant*, 556 U.S. 332, 346–47 (2009) (quoting *Long*, 463 U.S. at 1049).

Finally, every reasonable officer knew by clearly established law that the standard for assessing such intrusions on personal liberty during traffic stops is "reasonableness." *Wilson*, 519 U.S. at 411 ("[T]he touchstone of [the] analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security" (quoting *Mimms*, 434 U.S. at 108–09)).

In this case, Officer Helms and Officer Ellis indeed invoked "officer safety" as the reason why they sought, during the stop, to prohibit Sharpe from livestreaming while the stop was ongoing.  Providing further explanation as to why it was reasonable for him to perceive officer safety as being implicated, Officer Helms asserts that livestreaming "add[s] additional hazards" to traffic stops by "allow[ing] anyone watching" — an unknown but potentially large number of people — "to know where an officer is and what he or she is doing in real time."  In this manner, he contends, livestreaming via a platform like Facebook Live by someone inside a stopped vehicle has a unique capacity to "turn a routine traffic stop into a crowd-control operation, leaving the officer in an unsafe position."  But what was not clearly known to Officer Helms was whether his efforts to prohibit livestreaming during a traffic stop for officer safety violated Sharpe's First Amendment rights.  Indeed, no one has cited any case that addresses such conduct — whether in the Fourth Amendment context or, for that matter, in the First Amendment

21

context.  In the absence of such law, Officer Helms was entitled to qualified immunity, as the majority opinion holds, albeit following a different analysis.

The majority opinion applies a free-standing First Amendment analysis to the communication restriction, focusing on but a component of the seizure without addressing the seizure itself and its implication of the Fourth Amendment.  Thus, with its narrower focus, the opinion states that "livestreaming a police traffic stop is speech protected by the First Amendment," such that the burden shifts to the police officer to show that he had "weighty enough interests at stake," the prohibition "furthers those interests," and the prohibition is "sufficiently tailored to furthering those interests."  *Ante* at 8–9.  That is a traditional, freestanding First Amendment analysis that fails to account for the fact that the communication restriction was but a component of a seizure.  If the opinion were to recognize the Fourth Amendment context based on the overall activity involved, it would have articulated a Fourth Amendment analysis that would determine — somewhat different from the narrower First Amendment analysis — whether the restriction on livestreaming was "reasonable."  *Wilson*, 519 U.S. at 411 ("[T]he touchstone of [the] analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security" (quoting *Mimms*, 434 U.S. at 108–09)).  And this approach would be the traditional one taken.  When, during a lawful seizure, an officer demands identification, or orders a passenger to get out of the vehicle and remain at a distance from the driver, or orders an occupant to hand over a firearm temporarily during the stop — arguably implicating the First and Second Amendments, respectively —

22

courts traditionally conduct a Fourth Amendment analysis to determine whether the restrictions on otherwise protected conduct are reasonable.

While the majority opinion's free-standing First Amendment analysis might, but need not, ultimately lead to the same result, the Fourth Amendment analysis is grounded on a straightforward concept of reasonableness. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons . . . against *unreasonable* . . . seizures, shall not be violated" (emphasis added)).  And therefore in this case, the question would ultimately be whether prohibiting livestreaming by persons seized during traffic stops was reasonable, regardless of whether the restriction was imposed by individual officers or by town policy.

In any event, Sharpe has not identified any caselaw that clearly establishes that such a communication restriction was unreasonable.  Moreover, the question of whether such a restriction was Town of Winterville policy remains an open question.  I therefore concur in the judgment.